# EXHIBIT A

Case Search Portal

Case: SV-2026-CV-000009

# Cake N Cow Farms vs. Koch Ag & Energy Solutions, LLC, et al

## Case Summary

| | | | |
|---|---|---|---|
| Case Number | SV-2026-CV-000009 | Filed Date | 05/04/2026 |
| County | Stevens County | Judicial Officer | Ambrosier , Bradley — (05/04/2026) |
| Case Type | CV Other Civil (Non-Domestic) | Status | Pending 05/04/2026 |

## Case Details

### Case History

SV-2026-CV-000009 [Current]

| | | | |
|---|---|---|---|
| County | Stevens County | Judge | Ambrosier , Bradley |
| Transferred In | 05/04/2026 | | |

## Parties

**Cake N Cow Farms**
Plaintiff

**Koch Ag & Energy Solutions, LLC**
Defendant

**Koch Fertilizer, LLC**
Defendant

**Koch Agronomic Services, LLC**
Defendant

## Attorneys

**Diel, Isaac** Retained

| | | | |
|---|---|---|---|
| Type | Attorney | Representing | Cake N Cow Farms |
| Address | Sharp Law LLP 4820 W 75th St, Prairie Village, KS 66208 | Bar # | 14376 |

**Foreman, Nathanial** Retained

| | | | |
|---|---|---|---|
| Type | Attorney | Representing | Cake N Cow Farms |
| Address | Tate, Kitzke & Foreman LLC PO Box 909, Hugoton, KS 67951-0909 | Bar # | 22691 |

---

**Hepner, Hammons** Retained

| | | | |
|---|---|---|---|
| Type | Attorney | Representing | Cake N Cow Farms |
| Address | Sharp Law LLP 4820 W. 75th St, Prairie Village, KS 66208 | Bar # | 29138 |

---

**Six, Stephen** Retained

| | | | |
|---|---|---|---|
| Type | Attorney | Representing | Cake N Cow Farms |
| Address | Stueve Siegel Hanson Llp 460 Nichols Rd, Ste 200, Kansas City, MO 64112 | Bar # | 16151 |

---

**Stueve, Benjamin** Retained

| | | | |
|---|---|---|---|
| Type | Attorney | Representing | Cake N Cow Farms |
| Address | Stueve Siegel Hanson LLP 460 Nichols Rd, Ste 200, Kansas City, MO 64112 | Bar # | 28515 |

---

**Stueve, Patrick** Retained

| | | | |
|---|---|---|---|
| Type | Attorney | Representing | Cake N Cow Farms |
| Address | Stueve Siegel Hanson Llp 460 Nichols Road Suite 200, Kansas City, MO 64112 | Bar # | 13847 |

---

**Sharp, Rex** Retained

| | | | |
|---|---|---|---|
| Type | Attorney | Representing | Cake N Cow Farms |
| Address | Sharp Law LLP 4820 W 75th St, Prairie Village, KS 66208 | Bar # | 12350 |

---

**Colligan, Sean** Retained

| | | | |
|---|---|---|---|
| Type | Attorney | Representing | Koch Ag & Energy Solutions, LLC |

| | | | |
|---|---|---|---|
| Address | Stinson LLP 1201 Walnut, Ste 2900, Kansas City, MO 64106-2150 | Bar # | 25727 |

**Colligan, Sean** Retained

| | | | |
|---|---|---|---|
| Type | Attorney | Representing | Koch Fertilizer, LLC |
| Address | Stinson LLP 1201 Walnut, Ste 2900, Kansas City, MO 64106-2150 | Bar # | 25727 |

**Colligan, Sean** Retained

| | | | |
|---|---|---|---|
| Type | Attorney | Representing | Koch Agronomic Services, LLC |
| Address | Stinson LLP 1201 Walnut, Ste 2900, Kansas City, MO 64106-2150 | Bar # | 25727 |

## Events

| | | |
|---|---|---|
| 05/04/2026 | **PLE: Petition**<br>Comment: Petition | Index: 1 |
| 05/06/2026 | **ORD: Summons - Filer Drafted**<br>Comment: Summons to Koch Ag & Energy Solutions LLC | Index: 3 |
| 05/06/2026 | **ORD: Summons - Filer Drafted**<br>Comment: Summons to Koch Agronomic Services LLC | Index: 4 |
| 05/06/2026 | **ORD: Summons - Filer Drafted**<br>Comment: Summons to Koch Fertilizer LLC | Index: 5 |
| 05/12/2026 | **MOT: Motion (Generic)**<br>Comment: Unopposed Motion to Change Party Name | Index: 6 |
| 05/19/2026 | **ORD: Order (Generic)**<br>Comment: Order Granting Plaintiffs' Unopposed Motion to Change Party Name | Index: 7 |
| 05/19/2026 | **ORD: Summons - Filer Drafted**<br>Comment: Summons to Koch Ag & Energy Solutions LLC | Index: 8 |
| 05/19/2026 | **ORD: Summons - Filer Drafted**<br>Comment: Summons to Koch Agronomic Services LLC | Index: 9 |
| 05/19/2026 | **ORD: Summons - Filer Drafted**<br>Comment: Summons to Koch Fertilizer LLC | Index: 10 |

| | | |
|---|---|---|
| 05/28/2026 | **RET: Return of Service - Summons**<br>Comment: Affidavit of Service - Koch Ag & Energy | Index: 11 |
| 05/28/2026 | **RET: Return of Service - Summons**<br>Comment: Affidavit of Service - Koch Agronomic Services, LLC | Index: 12 |
| 05/28/2026 | **RET: Return of Service - Summons**<br>Comment: Affidavit of Service - Koch Fertilizer, LLC | Index: 13 |
| 06/05/2026 | **BON: Appearance**<br>Comment: Entry of Appearance - Sean W. Colligan for Defendants Koch Ag and Energy Solutions, LLC, Koch Fertilizer, LLC, and Koch Agronomic Services, LLC | Index: 14 |
| 06/05/2026 | **ORD: Clerk's Extension**<br>Comment: Clerks' Extension of Time for Defendants Kohn Ag & Energy Solutions, LLC, Koch Fertilizer, LLC, Koch Agronomic Services, LLC | Index: 15 |
| 06/05/2026 | **ORD: Clerk's Extension**<br>Comment: Clerk's Extension of Time for Defendants Kohn Ag & Energy Solutions, LLC, Koch Fertilizer, LLC and Koch Agronomic Services, LLC | Index: 16 |

## Financials

**Cake N Cow Farms,** (Plaintiff)

Balance as of 06/16/2026: **$0.00**

Docket/Filing Fees

| Transaction Type | Date | Receipt # | Charge | Payment | Credit |
|---|---|---|---|---|---|
| Charge | 05/04/2026 | | $195.00 | $0.00 | $0.00 |
| Payment | 05/04/2026 | OJA-2026-1661636 | $0.00 | -$195.00 | $0.00 |

## Documents

05/04/2026 Index: 1

**Petition**

PLE: Petition

Pages 49

05/06/2026 Index: 3

**Summons to Koch Ag & Energy Solutions LLC**

ORD: Summons - Filer Drafted

Pages 5

05/06/2026 Index: 4

**Summons to Koch Agronomic Services LLC**

ORD: Summons - Filer Drafted

Pages 5

05/06/2026 Index: 5

**Summons to Koch Fertilizer LLC**

ORD: Summons - Filer Drafted

Pages 5

05/12/2026 Index: 6

**Unopposed Motion to Change Party Name**

MOT: Motion (Generic)

Pages 3

05/19/2026 Index: 7

**Order Granting Plaintiffs' Unopposed Motion to Change Party Name**

ORD: Order (Generic)

Pages 2

05/19/2026 Index: 8

**Summons to Koch Ag & Energy Solutions LLC**

ORD: Summons - Filer Drafted

Pages 5

05/19/2026 Index: 9

**Summons to Koch Agronomic Services LLC**

ORD: Summons - Filer Drafted

Pages 5

05/19/2026 Index: 10

**Summons to Koch Fertilizer LLC**

ORD: Summons - Filer Drafted

Pages 5

05/28/2026 Index: 11

**Affidavit of Service - Koch Ag & Energy**

RET: Return of Service - Summons

Pages 3

05/28/2026 Index: 12

**Affidavit of Service - Koch Agronomic Services, LLC**

RET: Return of Service - Summons

Pages 3

05/28/2026 Index: 13

**Affidavit of Service - Koch Fertilizer, LLC**

RET: Return of Service - Summons

Pages 3

06/05/2026 Index: 14

**Entry of Appearance - Sean W. Colligan for all defendants**

BON: Appearance

Pages 1

06/05/2026 Index: 15

**Clerks' Extension of Time - all defendants**

ORD: Clerk's Extension

Pages 3

06/05/2026 Index: 16

**Clerk's Extension of Time - all defendants**

ORD: Clerk's Extension

Pages 3

ELECTRONICALLY FILED
2026 May 04 PM 4:14
CLERK OF THE STEVENS COUNTY DISTRICT COURT
CASE NUMBER: SV-2026-CV-000009
PII COMPLIANT

**IN THE DISTRICT COURT OF STEVENS COUNTY, KANSAS**

| | |
|---|---|
| COW N CAKE FARMS,<br><br>Plaintiff,<br><br>v.<br><br>KOCH AG & ENERGY SOLUTIONS, LLC; KOCH FERTILIZER, LLC; and KOCH AGRONOMIC SERVICES, LLC,<br><br>Defendants. | Case No. [______________]<br><br>**JURY TRIAL DEMANDED** |

(Pursuant to Chapter 60)

**PETITION**

# I. INTRODUCTION

1. This action arises from Defendants' conspiracy to fix, raise, maintain, and/or stabilize prices for nitrogen, phosphate and potassium (potash) fertilizers ("NPK Fertilizers") from at least as early as January 1, 2021 with their Co-Conspirators, until Defendants and their Co-Conspirators' unlawful conduct and its anticompetitive effects cease to persist.

2. Defendants—Koch Fertilizer, LLC and Koch Agronomic Services, LLC (collectively, "Koch")—and their Co-Conspirators are the dominant producers and sellers of NPK Fertilizers in the United States.

3. Among the victims of the conspiracy are indirect and direct purchasers of NPK Fertilizers from Defendants, including individual farmers/growers, agricultural cooperatives and retailers, fertilizer mixers, members of farming associations, farm and planting partnerships/company.

4. The U.S. fertilizer industry is one of the most concentrated in the American economy. Defendants and their Co-Conspirators (a handful of companies) control the overwhelming majority of domestic production capacity for each of the three primary plant nutrients. In nitrogen, CF Industries, Nutrien, Koch, and Yara collectively control approximately 82% of domestic production capacity, producing a market with a Herfindahl-Hirschman Index ("HHI") in the United States of approximately 2,382. In phosphate, Mosaic and Nutrien together control approximately 91% of domestic production capacity, yielding an HHI of approximately 4,553. In potash, Mosaic and Nutrien—operating through their jointly owned export vehicle, Canpotex—control approximately 90% of the North American supply, with an HHI of approximately 3,455. Each of these HHI figures show concentration levels that are well above the threshold at which the Department of Justice and the Federal Trade Commission presume a market to be "highly concentrated."

5. Using their market dominance, Defendants charged artificially inflated prices for NPK Fertilizers. The parallel nature of Defendants and their Co-Conspirators' pricing across all three NPK markets is striking. Defendants and their Co-Conspirators' public pricing disclosures and government data show a strong parallel pattern across nitrogen, phosphate, and potash: a sharp, synchronized increase in 2021 to 2022, a coordinated partial decline in 2023, and renewed parallel increases beginning in 2024 and continuing through the present. This lockstep pricing occurred across markets with different supply-demand fundamentals, different input cost structures, and different competitive conditions—a pattern that is inconsistent with independent competitive behavior but consistent with coordinated action. Further, Defendants and their Co-Conspirators had ample opportunity and motive to conspire through overlapping industry associations, conferences, and direct commercial relationships.

6. The United States Department of Justice has now opened an antitrust probe targeting CF Industries, Nutrien, Mosaic, Koch, and Yara examining whether these companies colluded to raise fertilizer prices. The DOJ investigation follows a series of escalating government actions reflecting bipartisan concern over fertilizer market concentration and pricing.

7. On September 26, 2025, USDA and the DOJ signed a Memorandum of Understanding committing both agencies to protect American farmers from the burdens imposed by high and volatile input costs, including fertilizer. On December 6, 2025, President Trump signed an Executive Order directing the Attorney General and the Chairman of the Federal Trade Commission to each establish a Food Supply Chain Security Task Force to investigate price fixing and anti-competitive practices across the food sector, with the fertilizer industry specifically identified as vulnerable to anti-competitive manipulation. In January 2026, USDA Deputy Secretary Stephen Vaden publicly accused Nutrien and Mosaic of operating a "duopoly" in

phosphate and potash, stating that the companies have been "constraining supply and driving up the price that farmers pay" and that the administration "is going to do everything it can" to ensure affordable fertilizer for American farmers.[1] On March 10, 2026, leaders from fourteen state corn grower associations—including Kansas—sent a joint letter to USDA Secretary Rollins and Attorney General Bondi calling for immediate action.[2] The letter reported that DAP, MAP, and potash fertilizers prices had increased drastically over the past year and that "the cost-income squeeze on American farmers has intensified."[3]

8. To provide a remedy for the injury suffered as a result of Defendants' conspiracy and illegal actions, Plaintiff brings this case on behalf of indirect purchasers of NPK Fertilizers against Defendants for violations of the Kansas Restraint of Trade Act and under common law for unjust enrichment. Plaintiff seeks damages, injunctive relief, disgorgement of illegally-obtained profits and the costs of pursuit of this action, including reasonable attorneys' fees, for the injuries that Plaintiff sustained as a result of the Defendants' conspiracy to fix, raise, maintain and/or stabilize the price, and limit, reduce and otherwise manipulate the supply, of NPK Fertilizers.

## II. JURISDICTION AND VENUE

9. This Court has both specific and general jurisdiction over Defendants and their co-conspirators because their wrongful acts occurred and caused damages to Plaintiff in this County, and Defendants are authorized to do and does substantial business in Kansas, both generally and specifically as to this case.

---

[1] A Conversation with USDA Deputy Secretary Stephen Vaden (Jan. 21, 2026), at 45:30–46:19; 46:40–47:19; 47:20–47:32, recording available at https://nationalaglawcenter.org/webinars/vaden/.
[2] Multi-State Corn Growers Ass'ns, Jt. Letter to the Honorable Pamela Bondi and the Honorable Brooke Rollins (March 10, 2026), available at https://kscorn.com/wp-content/uploads/2026/03/FertJointLetterCommsToolkit_031026.pdf.
[3] *Id.* at 1.

## III. PARTIES

10. Plaintiff purchased NPK Fertilizes in the state in which they reside or conduct business and suffered an economic injury as a result of Defendants and their Co-Conspirators' illegal conduct described in this Petition. Plaintiff intends to purchase NPK Fertilizer in the future.

### A. Plaintiff

11. Plaintiff Cow N Cake Farms is a general partnership with its principal place of business in Stevens County, Kansas. The members of the Plaintiff's general partnership are citizens of the state of Kansas. Plaintiff purchased NPK Fertilizers indirectly from Defendants for end use. By paying artificially inflated prices for NPK Fertilizers, Plaintiff suffered antitrust injury as a result of the antitrust violations alleged in this Petition.

### B. Defendants

#### 1. Koch Ag & Energy Solutions, LLC

12. Koch Ag & Energy Solutions, LLC ("KAES") is a limited liability corporation with its principal place of business at 4111 E. 37th St. N., Wichita, Kansas. KAES may be served through its registered agent at 4601 E Douglas Avenue #700, Wichita, Kansas, 67218. KAES is a is a wholly-owned subsidiary of Koch Inc and is the parent company of all Koch businesses that deal with the production, sale, and distribution of nitrogen fertilizer products.

13. KAES and its affiliates are collectively one of the world's largest producers and marketers of fertilizers, including ammonia, urea, UAN, phosphate, potash, and sulfur-based products.[4]

[4] Koch Ag & Energy Solutions, *Companies: Koch Fertilizer*, available at https://kochagenergy.com/companies.

**2. Koch Fertilizer, LLC**

14. Koch Fertilzier, LLC is a wholly owned subsidiary of Koch Ag & Energy Solutions, LLC, which is itself a wholly owned subsidiary of Koch Industries. Koch Fertilizer's headquarters are located at 4111 E 37th Street N, Wichita, Kansas, 67220. Koch Fertilizer may be served through its registered agent at 4601 E Douglas Avenue #700, Wichita, Kansas, 67218.

15. Koch Fertilizer manufactures, markets, and distributes more than 12 million metric tons of fertilizer products annually.[5] Koch Fertilizer LLC holds 50% ownership in Point Lisas Nitrogen Limited, with CF Industries Holdings, Inc. holding the other 50%.

**3. Koch Agronomic Services, LLC**

16. Koch Agronomic Services, LLC (KAS) is a wholly owned subsidiary of Koch Ag & Energy Solutions, LLC, which is itself a wholly owned subsidiary of Koch Industries. KAS's headquarters are located at 4111 E 37th Street N, Wichita, Kansas, 67220. KAS may be served through its registered agent at 4601 E Douglas Avenue #700, Wichita, Kansas, 67218. KAS is a leading manufacturer of nitrogen-based NPK Fertilizers throughout the United States.

**C. Unnamed Co-Conspirators and Other Non-Parties**

17. Various other persons, firms, and corporations not named as Defendants have participated as co-conspirators with Defendants and have performed acts in furtherance of the illegal conduct described. Defendants are jointly and severally liable for the acts of these unnamed co-conspirators.

18. Whenever reference is made to any act of any corporation, the allegation means that the corporation engaged in the act by or through its officers, directors, agents, employees, or

[5] Koch Fertilizer, *Quality Products. Proven Results*, available at https://kochfertilizer.com/products.

representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

19. Defendants are also liable for acts done in furtherance of the alleged conduct by companies they acquired through mergers and acquisitions.

## IV. FACTUAL ALLEGATIONS

### A. Background of NPK Fertilizers

20. Modern agriculture depends heavily on three essential nutrients that plants must have in large quantities: nitrogen (N), phosphorus (P), and potassium (K). These nutrients are supplied to crops through what farmers commonly call nitrogen, phosphate, and potash fertilizers—individually and in combination referred to as NPK Fertilizers (named after the chemical symbols for the nutrients they contain). Together they form the basis of most fertilizer programs around the world.

21. NPK Fertilizers may be applied individually or in blended formulations depending on crop and soil requirements. Farmers sometimes use single-nutrient products when a specific nutrient is needed, but the nutrients can also be combined into blended fertilizers containing nitrogen, phosphorus, and potassium in set proportions. These blends are typically labeled with three numbers indicating the percentage of each nutrient in the product.

22. The United States is one of the world's largest consumers of commercial fertilizers. The U.S. fertilizer market was valued at approximately $29 to 30 billion in 2024–2025 and is projected to grow to approximately $39 billion by 2031.[6] The global fertilizer market was valued

[6] Mordor Intelligence, United States Fertilizers Market Size & Share Analysis (2025) (reporting the U.S. fertilizers market at USD 29.93 billion in 2025, forecast to reach USD 39.92 billion by 2031 at a 5.0% CAGR).

at approximately $207 billion in 2024.[7] American farms cultivated more than 220 million acres of cropland in 2023, generating enormous and recurring demand for nitrogen, phosphate, and potash inputs.

23. Fertilizer demand in the United States is driven mainly by the intensive cultivation of row crops—particularly corn and soybeans—which account for the majority of planted acreage and fertilizer consumption. Indeed, corn production alone consumes approximately 45% of all nitrogen fertilizer applied domestically.[8] In 2023, U.S. farmers planted approximately 89.9 million acres of corn.[9] Demand for corn-based ethanol under the Renewable Fuel Standard further intensifies nitrogen fertilizer demand by mandating the conversion of over five billion bushels of corn annually into fuel. Every American farmer who grows corn, soybeans, wheat, or other major crops must purchase nitrogen, phosphate, and potash fertilizers each planting season, making these products a non-discretionary input cost that farmers cannot avoid.

24. NPK Fertilizers are favored over other fertilizers because they supply the three macronutrients that crops need in the largest amounts, are highly concentrated, predictable, and fast-acting, allowing farmers to efficiently meet crop nutrient requirements. Unlike organic fertilizers, NPK Fertilizers provide precise nutrient content, are easy to store and transport, release nutrients more quickly into the soil, and are adaptable to most major crops and soil types, making them the primary choice for high-yield, modern agriculture.

25. Kansas is the nation's leading wheat-producing state and a top-five corn-producing state, with approximately 46 million acres of farmland and approximately 58,500 farms. Kansas

[7] Global Market Insights, Fertilizer Market Size, Share, Growth & Forecast Report (2025) (reporting the global fertilizer market at USD 207.2 billion in 2024 and a 2034 forecast of $268.2 billion at a 2.6% CAGR).
[8] Market Data Forecast, U.S. Fertilizers Market Size (Oct. 2025).
[9] USDA, National Agricultural Statistics Service, Acreage Report (June 2023).

farmers are significant consumers of all three categories of fertilizer products—nitrogen, phosphate, and potash.

### 1. Nitrogen Fertilizers

26. Nitrogen fertilizers are widely used in agriculture because nitrogen is the nutrient plants require in the greatest quantity. Nitrogen is a key part of chlorophyll, the molecule that enables photosynthesis, and it is also necessary for the formation of proteins and other biological compounds involved in plant growth. Adequate nitrogen supports the development of leaves and stems and is associated with faster vegetative growth and higher crop yields.

27. The core feedstock for nitrogen fertilizer production is anhydrous ammonia, which is synthesized through the Haber–Bosch process. In this process, nitrogen gas from the air is combined with hydrogen, typically derived from natural gas, under conditions of high temperature and pressure in the presence of a catalyst to produce ammonia. This ammonia serves as the principal intermediate used to manufacture a variety of nitrogen fertilizer products.

28. Common nitrogen fertilizers include anhydrous ammonia, urea, ammonium nitrate ("UAN"), ammonium sulfate, and urea ammonium nitrate ("UAN") solution. Anhydrous ammonia, which contains 82 percent nitrogen, is the most concentrated nitrogen fertilizer. Because of its high nitrogen content, it is often the most cost-effective nitrogen fertilizer. Urea Ammonium Nitrate (UAN) solution, produced by combining urea, nitric acid, and ammonia, is a liquid fertilizer product with a nitrogen content that typically ranges from 28 percent to 32 percent. UAN can be applied more uniformly than non-liquid forms of fertilizer. It can be mixed with herbicides, pesticides, and other nutrients, enabling farmers to reduce costs by applying several materials simultaneously rather than making several separate applications. These fertilizers vary in nitrogen concentration and form but each supplies nitrogen that plants absorb as nitrate or ammonium ions. They are commonly sold as small, typically round granules or "prills."

**2. Phosphate Fertilizers**

29. Phosphate fertilizers supply phosphorus, an essential nutrient required for several core plant functions. Phosphorus plays an important role in energy transfer within plant cells, including through molecules such as ATP, and contributes to early plant development, root formation, and the production of flowers and seeds. Adequate phosphorus availability is therefore associated with strong root systems and successful crop establishment.

30. Phosphate fertilizers are produced from phosphate rock, a naturally occurring mineral resource mined from geological deposits. After mining, the rock is processed chemically, typically by treatment with acids, to convert the phosphorus into forms that plants can readily absorb. Phosphoric acid is then combined with ammonia to produce the principal finished phosphate fertilizer products: diammonium phosphate ("DAP") and monoammonium phosphate ("MAP"). These fertilizers are generally manufactured as dry granules that can be transported in bulk and applied directly to fields or blended with other nutrients in compound fertilizers.

**3. Potash Fertilizers**

31. Potash fertilizers supply potassium, another primary plant nutrient required for healthy crop growth. Potassium helps regulate water movement within plant tissues, activates enzymes involved in metabolism, and supports plant tolerance to environmental stresses such as drought or disease. Adequate potassium availability can contribute to improved crop quality and resilience.

32. Potash fertilizers are produced from naturally occurring potash ores formed from ancient, evaporated seas. These mineral deposits are mined or extracted from brines and then processed to separate potassium-bearing compounds suitable for agricultural use. The resulting products contain potassium in forms that plants can absorb as potassium ions.

33. The most widely used potash fertilizer is Potassium chloride, also known as muriate of potash ("MOP"), which is the most widely used potash fertilizer. Potassium sulfate, also known as sulfate of potash ("SOP"), is also used, particularly for crops that are sensitive to chloride. Potash fertilizers are typically sold as crystalline or granular solids that can be applied directly to fields or blended with other nutrients in compound fertilizers.

**B. Market Concentration for NPK Fertilizers**

34. The Fertilizer industry in the United States has long been characterized by significant consolidation. The NPK Fertilizer industry experienced a drastic consolidation following various market conditions dating back to the 1980s.[10]




35. As a result, today each of the major nutrient industries is dominated by a single corporation: Mosaic reigns over the American phosphate market, CF Industries commands the nitrogen sector, and Nutrien has taken charge of the North American potash market as the leading

[10] *See* Farm Action Fact Sheet: The Fertilizer Sector, available at https://farmaction.us/wp-content/uploads/2024/09/Fertilizer_Farm-Action.pdf ("The fertilizer industry has a historical precedence of extreme consolidation and anti-competitive behaviors…").

member along with Mosaic.[11] The number of firms in the market has reduced from 46 to 13 since the 1980s, with Defendants and their Co-Conspirators now controlling a substantial portion of the market.[12]

36. Given these extraordinary market shares, it is certain that Kansas farmers and agricultural retailers purchase substantial quantities of NPK fertilizers from Defendants and their Co-Conspirators.

**1. The nitrogen market in the United States**

37. Combined, Defendants and their Co-Conspirators control 82% of the North American fertilizer market for nitrogen:[13]




[11] Nathan Beacom, *Record Prices Give rise to Consolidation Concerns in the Fertilizer Industry*, Offrange (Sept. 23, 2022), available at https://ambrook.com/offrange/supply-chain/record-prices-consolidation-concerns-fertilizer-industry-ukraine-nitrogen.

[12] Noah Zahn, *The cost of growth: Fertilizer companies cash in while farmer and communities struggle*, Investigate Midwest (June 26, 2023), available at https://investigatemidwest.org/2023/06/26/the-cost-of-growth-fertilizer-companies-cash-in-while-farmers-and-communities-struggle/.

[13] Farm Action Fact Sheet: The Fertilizer Sector, available at https://farmaction.us/wp-content/uploads/2024/09/Fertilizer_Farm-Action.pdf.

38. CF Industries is the largest producer of ammonia in the world.[14] CF then sells ammonia as is or upgrades to other products such as urea, urea ammonium nitrate, and ammonium nitrate.[15]

39. Nutrien publicly states that it is the third-largest nitrogen producer in the world and the #2 North American nitrogen producer, with more than 7 million tonnes of annual gross ammonia nameplate capacity.[16]

40. Koch Fertilizer has substantial major nitrogen production and expansion projects in the United States, including in this District in Dodge City, Kansas.[17]

41. KAS is also directly involved in the commercialization of nitrogen fertilizer products. Koch materials identify ANVOL™, CENTURO™, and SUPERU™ as KAS trademarks, and KAS publicly markets those products as nitrogen-focused inputs intended for use with core nitrogen fertilizers sold in the market.[18] These public representations place KAS squarely within the commercial nitrogen fertilizer ecosystem as an entity actively marketing differentiated nitrogen products and technologies to growers and retailers.

---

[14] CF Industries, *Products*, available at https://www.cfindustries.com/products.

[15] *Id.*

[16] Nutrien, *Our business: Nitrogen*, available at https://www.nutrien.com/about/our-business/nitrogen.

[17] *E.g.,* Koch Fertilizer, *Koch Fertilizer Dodge City Marks 50 Years of Success*, available at https://kochfertilizer.com/newsroom/kf-dodge-city-celebrates-50-years (noting a $150 million investment in the Dodge City site, which produces anhydrous ammonia and UAN fertilizers).

[18] *See* Koch Fertilizer, *Quality Products. Proven Results*, available at https://kochfertilizer.com/products ("ANVOL™, CENTURO™, SUPERU™ and the SUPERU logo are trademarks of Koch Agronomic Services, LLC.").

42. Yara is the world's largest producer nitrogen fertilizers and nitrogen, phosphorus and potassium (NPK) fertilizers.[19] Yara North America's role in the conspiracy is amplified by Yara International's status as the world's largest global producer of nitrogen fertilizers.

43. Public statements show parallel nitrogen fertilizer price increases begin in 2021.

44. In a release about its Q4 and 2022 earnings, Nutrien reported on February 15, 2023, that its average, year-over-year, prices for Nitrogen Fertilizers increased across all forms. Specifically, it reported that ammonia prices increased from approximately $477 per metric ton (1,000 kg) in 2021 to approximately $973 per metric ton in 2022, a 104% increase; urea prices increased from approximately $478 per metric ton to approximately $696 per metric ton, a 46% increase; and prices for nitrates and other Nitrogen Fertilizers increased from $238 per metric ton to approximately $402 per metric ton, a 69% increase.

45. Only a few days later, on February 23, 2023, CF Industries revealed similar year-over-year price increases for its Nitrogen Fertilizers in its 2022 Annual Report. Specifically, it reported that ammonia prices increased from approximately $452 per metric ton in 2021 to approximately $849 per metric ton in 2022, a 88% increase; urea prices increased from approximately $397 per metric ton to approximately $574 per metric ton, a 45% increase; prices for UAN solution increased from $247 per metric ton to approximately $477 per metric ton, a 93% increase; and prices for ammonium nitrate increased from $269 per metric ton to approximately $480 per metric ton, a 78% increase.

---

[19] *See* Int'l Finance Corp., *IFC Project Information and Data Portal: Yara Corporate*, available as https://disclosures.ifc.org/project-detail/ESRS/38320/yara-corporate.

46. Defendants also exerted control over nitrogen imported to the United States. For example, in May 2022, Strike, an Australian urea producer, selected Defendant Koch Fertilizer, LLC as the preferred bidder for the offtake of 100% of 1.4 million mt/y of nitrogen urea production

47. Upon information and belief, and based on their own nitrogen fertilizer production capabilities, Yara International ASA and Yara North America, as well as Koch Fertilizer and KAS made similar price increases across their lines of nitrogen fertilizers.

**2. The phosphate market in the United States**

48. With Mosaic controlling a commanding 67% and Nutrien at 24%, two firms have 91% of the North American phosphate market controlled. [20]




49. Mosaic is the world's largest producer of finished phosphate products, with an annual operational capacity of approximately 16.8 million tonnes of concentrated phosphates—a capacity greater than the next two largest global phosphate producers combined.[21]

[20] Farm Action Fact Sheet: The Fertilizer Sector, available at https://farmaction.us/wpcontent/uploads/2024/09/Fertilizer_Farm-Action.pdf.
[21] *See* The Mosaic Company, *About: Who We Are*, available at https://mosaicco.com/About.

50. But in the United States, Mosaic's phosphate dominance is even more extreme. Mosaic produces over 64% of phosphate rock mined in the United States and manufactures 80% of phosphate fertilizers produced in North America. Mosaic has been estimated to control over 90% of phosphate-fertilizer sales to U.S. farmers.[22] Together, Mosaic and Nutrien represent over 90% of North American phosphate production capacity.[23]

51. Nutrien states that it is the second-largest phosphate producer in North America.[24]

52. Public statements show parallel phosphate fertilizer price increases begin in 2021.

53. In a release about its Q4 and 2022 earnings, Nutrien reported on February 15, 2023, that its average, year-over-year, price for phosphate fertilizer in North America increased from approximately $602 per metric ton in 2021 to approximately $806 per metric ton in 2022, a 34% increase.

54. On February 22, 2023, Mosaic made a similar announcement. In a release about its Q4 and 2022 earnings, Mosaic reported that its average price for phosphate fertilizer in North America increased from approximately $564 per metric ton in 2021 to approximately $804 per metric ton in 2022, a 43% increase. While Defendants and their Co-Conspirators' phosphate fertilizer prices began declining in 2023, the price decreases did not last. In 2025, Nutrien and Mosaic once again raised prices to similar levels.

55. In a release about its Q4 and 2025 earnings, Nutrien reported on February 18, 2026, that its price for phosphate fertilizer in North America increased from approximately $615 per metric ton in Q4 2024 to approximately $677 per metric ton in Q4 2025, a 10% increase. Similarly,

---

[22] Farm Action, Agricultural System Concentration Data, at 3 (Aug. 2024), available at https://farmaction.us/concentrationdata/.

[23] *Id.*

[24] Nutrien, *Our business: Phosphate*, available at https://www.nutrien.com/about/our-business/phosphate.

Mosaic reported on February 24, 2026, that its price for phosphate fertilizer in North America increased from approximately $593 per metric ton in Q4 2024 to approximately $686 per metric ton in Q4 2025, a 16% increase.

### 3. The potash market in the United States

56. Similarly, Nutrien has 55% of the market and Mosaic at 35%, leading to just three firms controlling at least 90% of the North American potash market.[25]




57. Nutrien publicly states that it is "the world's largest soft rock miner and potash producer" and the "#1 global potash producer."[26]

58. Mosaic has approximately 10.4 million tonnes of operational potash capacity, making it a major global potash producer and the second-largest potash producer in North America

[25] Farm Action Fact Sheet: The Fertilizer Sector, available at https://farmaction.us/wp-content/uploads/2024/09/Fertilizer_Farm-Action.pdf.
[26] Nutrien, *Our business: Potash*, available at https://www.nutrien.com/about/our-business/potash.

behind Nutrien. In North America, Mosaic accounts for approximately 35% of estimated annual potash production.[27]

59. Together, Mosaic and Nutrien account for roughly 90% of potash production capacity in North America.

60. Canpotex—a corporation jointly owned by Nutrien and Mosaic—produces approximately 13 million tonnes of potash annually, using mines owned by Nutrien and Mosaic.[28] The United States is heavily dependent on imported potash. The U.S. Geological Survey reported that U.S. net import reliance for potash was 93 percent of apparent consumption in 2024, and that Canada accounted for 79 percent of U.S. potash imports during 2020–2023.[29]

61. Given that degree of U.S. dependence on Canadian potash, major decisions concerning the routing, timing, and allocation of Saskatchewan potash exports are capable of affecting the overall supply of potash available to North American markets, including the United States. Thus decisions by a principal Saskatchewan export marketer such as Canpotex to direct potash tonnage into offshore channels, delay shipments, maintain port inventories, or commit forward volumes abroad would predictably influence the amount of comparable potash available for sale into or affecting the United States.

62. Public statements show parallel potash fertilizer price increases begin in 2021.

---

[27] Fitch Ratings, *Fitch Rates The Mosaic Company's Proposed Senior Unsecured Notes 'BBB'* (Nov. 10, 2025) available at https://www.fitchratings.com/research/corporate-finance/fitch-rates-the-mosaic-company-proposed-senior-unsecured-notes-bbb-10-11-2025.

[28] Canpotex, *Our Markets*, available at https://www.canpotex.com/what-we-do/our-markets/.

[29] *See* USGS, *Mineral Commodity Summaries: Potash*, available at https://pubs.usgs.gov/periodicals/mcs2025/mcs2025-potash.pdf.

63. In a release about its Q4 and 2022 earnings, Nutrien reported on February 15, 2023, that its average, year-over-year, price for Potash in North America increased from approximately $317 per metric ton in 2021 to approximately $667 per metric ton in 2022, a 110% increase.

64. On February 22, 2023, Mosaic made a similar announcement. In a release about its Q4 and 2022 earnings, Mosaic reported that its average price for Potash in North America increased from approximately $285 per metric ton in 2021 to approximately $632 per metric ton in 2022, a 122% increase.

65. While Defendants and their Co-Conspirators' Potash prices began declining in 2023, the price decreases did not last. In 2025, Nutrien and Mosaic once again raised prices to similar levels.

66. In a release about its Q4 and 2025 earnings, Nutrien reported on February 18, 2026, that its price for Potash in North America increased from approximately $270 per metric ton in Q4 2024 to approximately $305 per metric ton in Q4 2025, a 13% increase. Similarly, Mosaic reported on February 24, 2026, that its price for Potash in North America increased from approximately $199 per metric ton in Q4 2024 to approximately $264 per metric ton in Q4 2025, a 33% increase.

**4. Input price increases do not explain NPK Fertilizers price increases.**

67. Defendants and their Co-Conspirators have repeatedly attributed NPK Fertilizers price increases to general inflation, logistics disruptions, and global supply events, including, but not limited to, the war in Ukraine and the resulting sanctions on exports from Russia and Belarus.

68. But international supply disruptions do not fully explain the persistently high prices. For phosphate fertilizers, for instance, only 2% of fertilizer needs were met through imports in 2022.

69. Regarding potash, following the 2022 invasion of Ukraine, producers of potash outside of sanctioned countries would have been incentivized to increase supply levels in order to

take share from their competitors. Without any other restriction on the supply of potash, a continued expansion of supply should have resulted in prices falling back to pre-2022 levels. Yet prices have continued to stay at supracompetitive levels, well above those set out in 2021, throughout this period. Potash producers' refusal to cut their prices constitutes an action which would, absent a conspiracy to increase or stabilize prices, be against their economic self-interest.

70. In December 2025, the United States removed sanctions on Belarusian potash, a major source of supply, in exchange for the release of political prisoners. Still, the reaction in prices of potash was muted, with this reopened supply source failing to bring down prices.

71. Nor do input price increases explain the continually high price of nitrogen fertilizer. Prices remained elevated even when natural gas prices were relatively cheap.

72. Indeed, prices across all three fertilizer sources "remain[ed] stubbornly high," "even as commodity markets soften[ed]."[30]

73. On December 8, 2021, the Family Farm Action Alliance sent a letter to the United States Department of Justice, "calling for an investigation into the highly-consolidated fertilizer sector on the suspicion of anti-competitive practices." The letter called out Defendants and their Co-Conspirators' unsupported claims of supply issues:

> Claiming a global shortage, fertilizer companies have recently broken records with the ballooning prices they charge for fertilizer. Yet the companies' own documents refute any shortage claims and reveal they have additional capacity they're not utilizing. While it's true that natural gas prices are currently high, Yara's 2021 third quarter report states explicitly that this has had "[l]imited impact on finished fertilizer production to date; Yara is closely monitoring the situation going forward." Nutrien's annual report states that "due to historically low global ammonia prices we curtailed production . . . while maintaining flexibility to respond to improvements in the

[30] RealAgriculture, *Sticky input prices and short supplies: What's keeping fertilizer costs high?*, (Aug. 28, 2025), available at https://www.realagriculture.com/2025/08/sticky-input-prices-and-short-supplies-whats-keeping-fertilizer-costs-high/.

> market condition." Their potash capacity likewise exceeds current production levels, and in 2020 the cash cost to produce potash was $59 per tonne, the lowest level on record for Nutrien.[31]

### C. Government Investigation into Price-Fixing in the Fertilizer Industry

74. On September 26, 2025, the Department of Justice's Antitrust Division and the USDA signed a memorandum of understanding ("MOU") that formalized a partnership between the agencies to protect competition in key agricultural markets, including fertilizer.[32] The MOU emphasized the agencies' commitment to "protecting American farmers from the burdens imposed by high and volatile input costs," including fertilizer.[33] Nutrien further states that its potash business is paired with an extensive midstream distribution network and downstream retail platform, enabling it to produce and distribute potash products efficiently into North American and global markets.[34]

75. On October 28, 2025, President of the Iowa Corn Growers Association ("ICGA"), Mark Mueller, addressed a U.S. Senate Committee Hearing on Competition Issues in the Seed & Fertilizer Industries, telling them that "the massive increase in the cost of fertilizer is crushing corn growers in Iowa, and they aren't alone. Growers across the country are facing an impossible decision: buy fertilizer or stay solvent."[35] Mueller attributed the high fertilizer prices to two

---

[31] Letter to DOJ from Joe Maxwell, President of Family Farm Action Alliance (December 8, 2021), available at https://farmaction.us/wp-content/uploads/2021/12/FFAA_DOJ_Fertilizer_Investigation_Final.pdf (citations omitted).

[32] Dep't of Justice Office of Public Affairs, *Justice Department and USDA Coordinate to Protect Competition in Agricultural Inputs* (Sept. 29, 2025) available at https://www.justice.gov/opa/pr/justice-department-and-usda-coordinate-protect-competition-agricultural-inputs.

[33] *Memorandum of Understanding Between The Antitrust Division, Department of Justice and the Department of Agriculture Relative To Cooperation with Respect to Strengthening Competition for Agricultural Inputs* (Sept. 26, 2026) available at https://www.justice.gov/atr/media/1415501/dl?inline.

[34] Nutrien, *What we do: Production. Distribution. Retail. Support.*, available at https://www.nutrien.com/.

[35] Testimony of Mark Mueller President of the Iowa Corn Growers Association, U.S. Senate

decades of unchecked consolidation in the U.S. Fertilizer industry, which left only a few major companies controlling each market segment.[36]

76. According to Mueller, the effects of this market concentration had led to fertilizer costs that far outpaced the price farmers received for their corn.[37] For example, the amount of corn sales required to purchase one unit of monoammonium phosphate (a fertilizer that combines phosphorous and nitrogen) had increased from an average of 136 bushels over the last five years to 230 bushels today, increasing the economic pressure on farmers, as fertilizer prices escalate while crop revenues remain comparatively stagnant.[38]

77. In December 2025, President Donald Trump issued an Executive Order directing the U.S. Attorney General and the Chairman of the Federal Trade Commission to each establish a Food Supply Chain Security Task Force within their respective agencies to aggressively investigate price-fixing and anti-competitive practices across the food sector.[39]

78. On January 21, 2026, United States Department of Agriculture Deputy Secretary, Stephen Vaden, held a videotaped conversation with the National Agricultural Law Center, in which he attributed high fertilizer prices to anticipative conduct, telling the audience that

> Mosaic and Nutrien[] have a joint venture in Canada where they openly, their word[,] work together, my word, collude to control prices up there. That would be such a clear violation of the antitrust laws of the United States. They don't bring that joint venture

Committee Judiciary Hearing on Competition Issues in the Seed & Fertilizer Industries, (Oct. 28, 2025), available at https://www.grassley.senate.gov/imo/media/doc/mark_mueller_testimony_senate_judiciary_committee_submitted_version.pdf.

[36] *Id.*

[37] *Id.*

[38] *Id.*

[39] The White House, *Fact Sheet: President Donald J. Trump Addresses Security Risks from Price Fixing and Anti-Competitive Behavior in the Food Supply Chain* (Dec. 6, 2025), available at https://www.whitehouse.gov/fact-sheets/2025/12/fact-sheet-president-donald-j-trump-addresses-security-risks-from-price-fixing-and-anti-competitive-behavior-in-the-food-supply-chain/.

> officially down here in the United States, but what they've been able to manage to do through other means is achieving the same result, constraining supply and driving up the price that farmers pay. It's unacceptable.[40]

News coverage noted that Deputy Secretary Vaden later described Nutrien and Mosaic as having a grip on the fertilizer market as a "duopoly" driving up costs.[41]

79. In February 2026, both the ICGA[42] and the Texas Corn Producers Association[43] sent separate letters to U.S. Attorney General Pam Bondi seeking information about what the U.S. Department of Justice is doing to pursue possible antitrust actions against the fertilizer industry. As reported by Progressive Farmer, the letters reflect farmers' growing frustrations over lower crop returns while fertilizer prices continue to remain high.[44]

80. On March 4, 2026, Bloomberg reported that the DOJ Antitrust Division had opened a formal antitrust investigation into the pricing practices of major Fertilizer producers to determine whether they colluded or coordinated to raise nitrogen, phosphate and potash fertilizer prices for U.S. farmers.[45] Bloomberg further reported that the investigation is looking at CF Industries, Koch Inc., Mosaic, Nutrien, and Yara International.[46] Those companies are the dominant suppliers of

---

[40] A Conversation with USDA Deputy Secretary Stephen Vaden (Jan. 21, 2026), at 46:40-47:19. recording available at https://nationalaglawcenter.org/webinars/vaden/.

[41] John Dobberstein, *Feds Scrutinizing Fertilizer Industry, Alleged Mosaic and Nutrien 'Duopoly'*, No-Till Farmer (Jan. 26, 2026), available at https://www.no-tillfarmer.com/articles/14989-feds-scrutinizing-fertilizer-industry-alleged-mosaic-and-nutrien-duopoly.

[42] Iowa Corn Growers Ass'n, Letter to U.S. Attorney General Pam Bondi (Feb. 5, 2026), available at https://x.com/iowa_corn/status/2019456648654315988.

[43] Texas Corn Producers Ass'n, Letter to U.S. Attorney General Pam Bondi (Feb. 10, 2026), available at https://texascorn.org/wp-content/uploads/2026/02/TCPADOJStatusLetter_021026.pdf.

[44] Chris Clayton, *Report: DOJ Looking at Fertilizer Cos.*, Progressive Farmer (Mar. 5, 2026), available at https://www.dtnpf.com/agriculture/web/ag/crops/article/2026/03/05/iowa-corn-growers-urge-doj-press.

[45] Josh Sisco and Ilene Peng, *DOJ Probes US Fertilizer Market for Possible Price Fixing* (Mar. 4, 2026 at 12:26 p.m.), available at https://www.bloomberg.com/news/articles/2026-03-04/doj-probes-us-fertilizer-market-for-possible-price-fixing

[46] *Id.*

fertilizer products in the United States.[47] Sources told reporters the government inquiry is examining whether coordinated pricing or supply decisions crossed the line into civil or criminal antitrust violations.[48]

**D. Prices for NPK Fertilizers remain elevated despite lower input costs and lower demand.**

81. Before the start of the conspiracy, NPK Fertilizer price increases were typically transitory, and market forces corrected pricing (consistent with a competitive market).

82. NPK Fertilizer prices became significantly elevated as a result of Defendants and their Co-Conspirators' conduct.

83. For example, in 2021, the wholesale fertilizer index increased by over 60% when compared to 2020. The pricing trends continued. In 2022, wholesale fertilizer prices rose dramatically higher, averaging 132% higher than 2020 prices:




[47] Chris Clayton, *Report: DOJ Looking at Fertilizer Cos.*, Progressive Farmer (Mar. 5, 2026), available at https://www.dtnpf.com/agriculture/web/ag/crops/article/2026/03/05/iowa-corn-growers-urge-doj-press.

[48] *Id.*

84. Across the individual components of NPK Fertilizers, publicly available pricing disclosures show a strong parallel pattern: a sharp increase in 2021 to 2022, price decreases in 2023, and renewed increases beginning in 2024 and continuing through the present:

**Nitrogen Fertilizer Producer Price Index for 2016 - 2026**




**Phosphate Fertilizer Producer Price Index for 2016 - 2026**



**Potash Producer Price Index for 2016 – 2022[49]**




85. Nitrogen prices spiked in 2021-2022. By December 2021, the USDA estimated year-over-year price increases of 235% for anhydrous ammonia, 149% for urea, and 192% for liquid nitrogen (32% UAN):[50]




---

[49] Data discontinued after 2022.

[50] Angelica Williams and Amy Boline, *Fertilizer prices spike in leading U.S. market in late 2021, just head of 2022 planting season*, USDA – Economic Research Service (Feb. 9, 2022), available at https://www.ers.usda.gov/data-products/charts-of-note/chart-detail?chartId=103194.

86. Beginning in mid-2024, fertilizer prices across all three nutrient categories began rising again:[51]




87. These increases cannot be explained by input costs or other macroeconomic factors. In 2021, Nutrien's gross manufacturing profit margin was 669% from 2020, even though its costs of goods sold only increased 58% percent.[52] This dramatic expansion of profits continued into 2022, with Mosaic improving on its 2021 profits by 120%, Nutrien by 142%, and CF by 212%.[53]

88. Indeed, Defendants and their Co-Conspirators continued to reap profits:

[51]Faith Parum, *Fertilizer Outlook: Global Risks, Higher Costs, Tighter Margins*, Am. Farm Bureau Fed'n – Market Intel (Sept. 11, 2025), available at https://www.fb.org/market-intel/fertilizer-outlook-global-risks-higher-costs-tighter-margins.

[52] Farm Action Fact Sheet: The Fertilizer Sector, available at https://farmaction.us/wp-content/uploads/2024/09/Fertilizer_Farm-Action.pdf.

[53] *Id.*




89. The parallel resumption of price increases across all three nutrient markets in 2024–2026—after the 2023 decline—replicates the same synchronized pattern observed during the 2021–2022 spike. This pattern of recurring, synchronized price movements across three chemically distinct product categories is more consistent with coordinated conduct than with independent pricing decisions made by firms responding to different cost structures and supply-demand conditions.

90. Rather, Defendants and their co-conspirators pretextually asserted that their Fertilizer price hikes were the result of increasing natural gas prices. While it is true that natural gas represents the primary input cost for Nitrogen Fertilizer production, as it is used both as the principal feedstock for ammonia synthesis and as a major source of energy in the Nitrogen

Fertilizer manufacturing process, natural gas prices account for just approximately 15 percent of the variable costs for nitrogen.

91. Yara's own financial reports concede the minimal impact of increased natural gas prices: Yara's 2021 third quarter report explicitly stated that the rise in natural gas prices had a "limited" "impact on finished fertilizer production."[54] Yara reported in 2022 quarterly reports that it experienced similar inflated profit margins due to "higher ammonia prices" and "higher production margins on ammonia."[55]

92. In May 2022, Nutrien similarly reported increased profitability in its Nitrogen sector, which it too attributed to "[h]igher net realized selling prices [that] more than offset higher natural gas costs."[56]

93. Likewise, in its 2022 Annual Report CF Industries Holdings reported a 265 percent increase in net earnings from 2021 to 2022. CF Industries Holdings claimed the increase was "due primarily to higher average selling prices partially offset by higher natural gas costs,"[57] i.e., an admission that it increased prices above input costs. This is unsurprising, as Fertilizer prices rose at a far more drastic rate than natural gas prices.

---

[54] Yara Int'l ASA, "Yara Third-Quarter Report 2021" at 6, available at https://www.yara.com/siteassets/investors/057-reports-and-presentations/quarterly-reports/2021/3q-2021/yara-3q-2021-report.pdf.

[55] Yara Int'l ASA, "Yara Integrated Report 2021: Growing a Nature-Positive Food Future" at 60, 177, available at https://www.yara.com/siteassets/investors/057-reports-and-presentations/annual-reports/2021/yara-integrated-report-2021.pdf.

[56] Nutrien, Press Release: "Nutrien Delivers Earnings Growth and Expects Strong Market Fundamentals in 2023" (Nov. 2, 2022), https://www.nutrien.com/news/press-releases/nutrien-delivers-earnings-growth-and-expects-strongmarket-fundamentals-in-2023-1655.

[57] CF Industries Holdings, Inc., Quarterly Report on Form 10-Q for the Fiscal Quarter Ended June 30, 2021 (Aug. 9, 2021), available at https://www.sec.gov/Archives/edgar/data/1324404/000132440421000021/cf-20210630.htm.

94. Supply chain, transportation, and logistics disruptions during 2021 and 2022 also do not explain the dramatic price increases in Nitrogen, Phosphate, and Potash Fertilizer Products. To start, Nitrogen and Phosphate are not imported into the United States in substantial amounts. A University of Illinois study found that in 2024, the U.S. Fertilizer Net Import Reliance (measured as imports - exports +/- stock adjustments as % of consumption) for Nitrogen was as low as 6 percent. In 2024, the U.S. Net Import Reliance of Phosphate was only 13 percent, and that reflects recent increases that depart from the U.S.'s longstanding near-exclusive reliance on domestic Phosphate products; it was estimated that in 2022 only two percent of U.S. Phosphate Fertilizers were imported.

95. Economic research reveals that Fertilizer prices correlate not with natural gas prices, but with crop prices—a reflection that Fertilizer manufacturers price their products based on their assessment of what farmers are able to pay:

a. A 2015 study by USDA economists found that the correlation between natural gas and ammonia (nitrogen) Fertilizer prices decoupled in 2008, and Fertilizer prices began tracking the price of corn.[58]

b. A 2016 University of Illinois analysis concluded that the "tight relationship" between Fertilizer prices and natural gas prices "has not existed since 2008" and instead found that the "corn price serves as an indicator of demand for nitrogen fertilizer, with higher prices likely indicating more corn acres and the need for more nitrogen."[59]

---

[58] Beckman & S. Riche, Changes to the Natural Gas, Corn, and Fertilizer Price Relationships From The Biofuels Era, 47(4) Journal of Agricultural and Applied Economics, 494-509 (2015), available at https://www.cambridge.org/core/journals/journal-of-agricultural-and-applied-economics/article/changes-to-thenatural-gas-corn-and-fertilizer-price-relationships-from-the-biofuelsera/1C0E7C415B04E10BFE0BBA54105A59A5.

[59] Gary Schnitkey, "Anhydrous Ammonia, Corn, and Natural Gas Prices over Time," Farmdoc Daily (June 14, 2016), https://farmdocdaily.illinois.edu/2016/06/anhydrous-ammonia-corn-and-natural-gas-prices.html.

c. Research conducted by the USDA finds that, at least until 2021, Fertilizer prices closely tracked the prices of wheat and corn.[60]

96. Several studies have linked this correlation in prices of Fertilizer and corn to the collective price power of major Fertilizer producers such as Defendants. A 2021 University of Illinois article suggested that "demand conditions and assessment of farmers' abilities to pay influence nitrogen fertilizer companies' pricing decisions."[61] A 2022 Farm Action Special Report found that "[w]hat appears more likely than global shortages is that [Fertilizer] price hikes are aligned with the rising prices farmers are able to get their grain harvest," concluding that "[i]f these corporations are tying the price of their products to the farmer's ability to pay, rather than to supply and demand, that equates to an abuse of the market."[62]

97. In a competitive market, one would expect the prices of these products to be driven by their respective cost structures and supply-demand fundamentals, producing differentiated price trajectories. The tight synchronization of prices across all three markets is anomalous in a competitive setting and is more consistent with coordinated conduct among Defendants and their Co-Conspirators who—uniquely in these markets—participate across multiple nutrient categories and maintain formal and informal mechanisms for the exchange of competitively sensitive information.

---

[60] Angelica Williams et al., U.S. Dep't of Agriculture, Econ. Research Serv., Drivers of Fertilizer Markets: Supply, Demand, and Prices (Sept. 2025), https://www.ers.usda.gov/sites/default/files/_laserfiche/publications/113324/ERR-354.pdf?v=83545.

[61] Gary Schnitkey et al., *Nitrogen Fertilizer Prices and Supply in Light of the Ukraine-Russia Conflict*, Farmdoc Daily (Apr. 5, 2022), https://farmdocdaily.illinois.edu/2022/04/nitrogen-fertilizer-prices-and-supply-in-light-of-theukraine-russia-conflict.html.

[62] Sarah Carden, Farm Action, *Big Fertilizer: Measuring the Impacts of Food and Farm System Concentration* (Jan. 19, 2022), https://farmaction.us/wp-content/uploads/2022/01/Big-Fertilizer_-Measuring-the-Impacts-of-Food-and-Farm-System-Concentration.pdf.

**E. The structure and characteristics of the market for NPK Fertilizers support the existence of a conspiracy.**

98. Economic literature makes clear that structural market factors can be important in assessing whether conspiratorial conduct in violation of the antitrust laws has occurred. While collusion can occur in almost any industry, it is more likely to occur in some industries than in others. An indicator of collusion may be more meaningful when industry conditions are already favorable to collusion.

99. Many conditions make the fertilizer industry conducive to cartelization, for individual nutrients and all three nutrients together. These factors include supply-side concentration, standardization of the products, easy explicit and tacit communication between members, high barriers to entry, inelastic demand, and corporate and government control of limited reserves. Observed sustained high profit margins, excess capacity, and the concomitant movement of nitrogen, phosphorus, and potash prices are also consistent with cartel behavior.

**1. Supply-Side Concentration**

100. Defendants and their Co-Conspirators are among the largest producers of NPK Fertilizers sold in the United States and together control over 80% of the North American nitrogen fertilizer market[63] and over 90% of the North American phosphate[64] and potash markets.[65] Because the manufacture of NPK Fertilizers is highly concentrated, with the Defendants and their Co-Conspirators controlling the vast majority of production, the NPK Fertilizer market is highly susceptible to collusion.[66]

---

[63] Farm Action Fact Sheet: The Fertilizer Sector, available at https://farmaction.us/wp-content/uploads/2024/09/Fertilizer_Farm-Action.pdf.

[64] *Id.*

[65] *Id.*

[66] U.S. Dep't of Justice – Antitrust Division, *Preventing And Detecting Bid Rigging, Price Fixing, And Market Allocation In Post-Disaster Rebuilding Projects* (Oct. 10, 2023), available at https://www.justice.gov/atr/preventing-and-detecting-bid-rigging-price-fixing-and-market-

101. Economists from Texas A&M University's Agricultural and Food Policy Center recently prepared a paper examining fertilizer market conditions. Using the Herfindahl–Hirschman Index, a commonly accepted measure of market concentration,[67] the paper found strong levels of concentration in the fertilizer market:[68]

**Table 2. Herfindahl-Hirschman Index (HHI) measure for Fertilizers by Geographic Scope**

| Geographic Scope | United States | North America | World |
|---|---|---|---|
| Potash | 3,455 | 4,255 | 1,011 |
| Nitrogen | 2,382 | 2,242 | 368 |
| Phosphate | 4,553 | 4,533 | 152 |

Such levels indicate a highly concentrated market, greatly exceed the threshold set by the Department of Justice and FTC in horizontal merger analyses, raises significant competition concerns, and is presumptively susceptible to coordinated anticompetitive conduct.[69]

102. The paper also summarized the four-firm concentration levels, noting that in the United States, the markets for potash and phosphate were dominated by the top four firms, and 77% of the top four firms controlled the nitrogen fertilizer market in the United States:[70]

allocation-post-disaster-rebuilding ("Collusion is more likely to occur if there are few sellers. The fewer the number of sellers, the easier it is for them to get together and agree on prices, bids, customers, or territories.").

[67] U.S. Dep't of Justice – Antitrust Division, *Herfindahl-Hirschman Index*, available at https://www.justice.gov/atr/herfindahl-hirschman-index.

[68] Bart L. Fischer, *et al.*, *Concentration and Competition in the U.S. Fertilizer Industry*, Agricultural and Food Policy Center Texas A&M University (March 2024) available at https://afpc.tamu.edu/research/publications/725/BP-24-1_AFPC-Fertilizer-Markets-May-2024.pdf.

[69] *See* U.S. Department of Justice & FTC, Merger Guidelines § 2.1 n.14 (2023) (Markets in which the HHI is between 1,000 and 1,800 points to be "moderately concentrated" and markets in which the HHI is in excess of 1,800 points to be "highly concentrated.").

[70] *Id.*

**Table 3. Four-firm concentration (CR4) measure for Fertilizers by Geographic Scope**

| Geographic Scope | United States | North America | World |
|---|---|---|---|
| Potash | 100% | 99% | 84% |
| Nitrogen | 77% | 77% | 13% |
| Phosphate | 100% | 100% | 25% |

103. The Texas A&M paper concluded that "Our work found that increases in the cost of natural gas prices explained less than 20% of the increase in fertilizer prices paid by producers in 2022."[71]

104. Production-level dominance tells only part of the story. Over decades of mergers and acquisitions, Defendants have extended their control far beyond the mine and manufacturing plant, building vertically integrated systems that reach all the way to the farm gate. This integration—spanning production facilities, terminal networks, wholesale distribution, and direct retail—magnifies the anticompetitive effects of coordinated production decisions by creating additional channels through which pricing signals and supply-discipline strategies are transmitted directly to end-users without any independent intermediary to challenge them. And it also gives each Defendant and their Co-Conspirator real-time visibility into downstream demand, competitor inventory levels, and retail pricing across the market—a continuous intelligence stream that makes coordinated pricing easier to implement, easier to monitor, and harder for any deviation to go undetected.

105. In January 2023, the USDA published survey results in response to the Public Request for Information on Access to Fertilizer. Of the 1,494 comments submitted to the USDA, 87% of commenters described concerns about high prices, and 72% described concerns about the

[71] Bart L. Fischer, *et al.*, *Concentration and Competition in the U.S. Fertilizer Industry*, Agricultural and Food Policy Center Texas A&M University (March 2024), at 16.

power of fertilizer manufacturers.[72] Farmers attributed price increases to a few unaccountable fertilizer manufacturers who have extensive control over retail, transport, production markets, and "every step in the process," with one commenter saying that "[e]xcessive price increase of fertilizer appears to be fueled by greed within the small group of fertilizer manufacturers."[73]

106. Commenters pointed out how some manufacturers may have business lines as, for example, fertilizer seller and retailer buyer; this gives them power to "force other [retailers dependent on the manufacturer's product] to buy at inflated prices."[74] Regarding fertilizer distribution, the USDA found that one commenter described how: "'large distributors' are 'acquiring small manufacturers'; and 'effectively lock[] up retail locations from being approached' by competitor manufacturers, by 'eliminating competing products from [acquired manufacturers' catalog and consolidate to one product]' and 'forc[e downstream] retail locations to place large minimum orders.'"[75]

107. Specifically for Defendants here, Koch is vertically integrated and its integration illustrates the devastating effects on competition when consolidation and vertical integration join forces. Koch owns major ammonia pipeline running from Gulf Coast production facilities into the Corn Belt—along with the ammonia terminals connected to it. This acquisition gave Koch control over critical last-mile nitrogen delivery infrastructure before Koch was even a primary nitrogen producer. In 2022, Koch acquired 50% interest in Jorf Fertilizers Company III, the world's largest phosphate mining group.

---

[72] U.S.D.A. Agricultural Mktg. Serv., *Summary of Comments to "Access to Fertilizer: Competition and Supply Chain Concers"* (Jan. 2023), available at https://www.ams.usda.gov/sites/default/files/media/USDAFertilizerCommentSummary.pdf.
[73] *Id.*
[74] *Id.*
[75] *Id.*

108. Koch continued its vertical expansion in 2024 by completing the acquisition of a nitrogen fertilizer plant in Wever, Iowa. This acquisition gave Koch control of the largest nitrogen facility in the world and left lawmakers and farmers disappointed because they were hoping for more competition in the market to keep prices down. Koch maintains a global network of 50+ terminals that allows it to source product from its own production facilities or from third-party suppliers and to direct supply toward whichever market presents the most favorable pricing opportunity at any given time—allowing it to manage supply levels and support supracompetitive prices in target markets.

**2. Standardization**

109. NPK Fertilizers are standardized because their nutrients are basic chemical components traded as commodities and used interchangeably, regardless of the specific source. This standardization also makes it easier for competing firms to coordinate on a common price structure.[76]

110. NPK Fertilizers are fungible, homogenous commodity products with little differentiation, and one supplier's type is readily substituted for another supplier. As a result, buyers make purchase decisions based largely, if not entirely, on price.

**3. Opportunities to collude**

111. Collusion also may be facilitated by trade associations.[77] Here, Defendants and their Co-Conspirators have had multiple opportunities to collude through trade associations to which they belonged and served as board members.

---

[76] *Id.* ("The more standardized a product is, the easier it is for competing firms to reach agreement on a common price structure. It is much harder to agree on other forms of competition, such as design, features, quality, or service").

[77] *Id.* ("Collusion is more likely if the competitors know each other well, through social connections, trade associations, legitimate business contacts, or shifting employment from one company to another.").

112. For example, Defendant Koch Agronomic Services, is an active member of the International Fertilizer Association ("IFA"),[78] a global fertilizer association, headquartered in Paris, France.[79]

113. IFA sponsors a number of recurring in-person trade events including the IFA Annual Conference and the Cultivating Tomorrow Conference.[80]

114. Similarly, Defendant Koch Fertilizer, LLC is a member and includes a Board member of The Fertilizer Institute ("TFI"), a national fertilizer industry organization headquartered in Arlington, Virginia.[81] Besides offering exclusive members-only "market volatility information and resources,"[82] TFI also sponsors a number of trade events, including an Annual Business Conference, Agronomy Conference and Expo, World Fertilizer Conference, and Market & Logistics Conference.[83]

115. Other Co-Conspirators are members of Fertilizer Canada ("FC"), a Canadian fertilizer industry organization headquartered in Ottawa, Ontario.[84] CF Industries, Inc., Koch Fertilizer Canada, ULC, The Mosaic Company, Nutrien, and Yara North America, Inc. are members of the Board of FC.[85] FC is an organization representing producers, manufacturers, wholesale and retail distributors of nitrogen, phosphate, potash and sulfur fertilizers.[86]

---

[78] Int'l Fertilizer Ass'n, *Our Members*, available at https://www.fertilizer.org/about-ifa/our-members/.
[79] Int'l Fertilizer Ass'n, *Contact Us*, available at https://www.fertilizer.org/about-ifa/contact-us/.
[80] Int'l Fertilizer Ass'n, *Events*, https://www.fertilizer.org/news-events/events/.
[81] The Fertilizer Institute, *Leadership*, https://www.tfi.org/about-us/leadership/.
[82] The Fertilizer Institute, *Market Intelligence Insights*, https://www.tfi.org/insights/market-intelligence-insights/.
[83] The Fertilizer Institute, *Event Calendar*, https://www.tfi.org/events/event-calendar/.
[84] Fertilizer Canada, *About*, https://fertilizercanada.ca/about/.
[85] *Id.*
[86] *Id.*

116. Nutrien Ltd., The Mosaic Company, and Koch Sulfur Products Company L.L.C., are all members[87] and Board members[88] of The Sulfur Institute ("TSI"), a global association for sulfur and sulfuric acid professionals, based in Washington, D.C.[89] TSI sponsors a number of in-person trade events each year, such as the Sulphur World Symposium and its annual Executive Committee Meeting.[90] Sulfur is used to processing phosphate rock into phosphate fertilizers.[91]

117. Defendant Koch Fertilizer LLC also has a Board member on the Fertilizer Industry Round Table ("FIRT"), a fertilizer trade group.[92] FIRT hosts an annual meeting, in partnership with TFI.[93]

118. Defendant Koch Agronomic Services, LLC is a member of the Agricultural Retail Association ("ARA"), an industry trade group based in Arlington, Virginia.[94] ARA hosts a number of recurring in-person events, including the Annual ARA Conference and Expo,[95] in addition to semi-annual in-person meetings of ARA committees.[96]

[87] The Sulfur Institute, *About TSI: Member Companies*, https://www.sulphurinstitute.org/about-tsi/member-companies/.
[88] The Sulfur Institute, *About TSI: Board of Directors*, https://www.sulphurinstitute.org/about-tsi/board-of-directors/.
[89] The Sulfur Institute, *About TSI: Mission and Programs*, https://www.sulphurinstitute.org/about-tsi/mission-and-programs/.
[90] The Sulfur Institute, *Events: TSI Meetings and Events*, https://www.sulphurinstitute.org/events/tsi-meetings-and-events/.
[91] USGS, *Fertilizers—Sustaining Global Food Supplies*, available at https://pubs.usgs.gov/fs/fs155-99/fs155-99.pdf.
[92] Fertilizer Industry Round Table, *About: Current Board*, http://www.firt.org/about/current-board.
[93] Fertilizer Industry Round Table, *About*, http://www.firt.org/about.
[94] Agricultural Retailers Ass'n, *ARA Members*, https://www.aradc.org/members.
[95] Agricultural Retailers Ass'n, *Amplify ag retail at the 2026 ARA Conference and Expo in Austin, Texas*, https://www.aradc.org/2026-conference-expo.
[96] Agricultural Retailers Ass'n, *ARA Committees*, https://www.aradc.org/get-involved.

**4. High Barriers to Entry**

119. There are also high barriers to becoming a manufacturer of NPK Fertilizers. Economic authorities recognize that structural features such as high barriers to entry, homogeneous products, transparency, and vertical integration make cartelization more plausible and more sustainable by reducing the likelihood that new competitors will enter and disrupt supracompetitive pricing.[97] A large capital investment is required to enter the NPK Fertilizer industry, as companies wishing to enter must purchase machines and operating space to manufacture NPK Fertilizers.

120. For example, nitrogen fertilizers require the energy-intensive Haber-Bosch process to create ammonia and further specialized facilities and equipment for the refinement of ammonia into UAN or urea is needed.[98] Similar constraints exist for both phosphate[99] and potash.[100] And the importance of research and development in the industry also may deter new entrants.[101]

[97] Organisation for Economic Co-Operation and Development, *Use of Economic Evidence in Cartel Cases* (Dec. 8, 2023) available at https://one.oecd.org/document/DAF/COMP/GF%282023%295/en/pdf.

[98] Sarah Sellars, *Synthetic Nitrogren Fertilizer in the U.S.*, Farmdoc Dailey (Feb. 17, 2021) available at https://farmdocdaily.illinois.edu/2021/02/synthetic-nitrogen-fertilizer-in-the-us.html.

[99] Phosphate rock ore—which is used as intermediate feedstocks in the manufacture of granular and liquid ammonium phosphate fertilizers and animal feed supplements—is mined in only a handful of states and by a few companies. *See* U.S. Dep't of the Interior, *Mineral Commodity Summaries 2025*, at 134 (March 2025) available at https://pubs.usgs.gov/periodicals/mcs2025/mcs2025.pdf. The byproduct of processing phosphate ore into phosphoric acid for fertilizer production contains radium that then decays into radon gas, and EPA regulations require this byproduct to be carefully managed to limit public exposure. U.S. Env't Prot. Agency, *Phosphogypsum*, available at https://www.epa.gov/radiation/phosphogypsum.

[100] Because fertilizers producers in the United States rely heavily on potash import (with 79% coming from Canada), fertilizer producers depend on a small number of established producing regions and firms. *See* U.S. Dep't of the Interior, *Mineral Commodity Summaries 2025*, at 146–47 (March 2025) available at https://pubs.usgs.gov/periodicals/mcs2025/mcs2025.pdf.

[101] *See, e.g.,* Rong Lan *et al.*, *Synthesis of ammonia directly from air and water at ambient temperature and pressure* (discussing use of Haber-Bosch process and requiring specialized facilities capable of producing extreme heat and pressures to synthesize ammonia from nitrogen)

121. Potential entrants to the industry also must make a significant financial investment to acquire, maintain and update production facilities and equipment. Larger players have an advantage because they are able to build or acquire multiple manufacturing facilities, discouraging others from entering. Thus, the start-up capital necessary to compete with today's NPK Fertilizer manufacturers would be substantial. NPK Fertilizer manufacturers have significant economies of scale, utilizing large and expensive production facilities. Barriers to entry in NPK Fertilizer manufacturing both prevent new competitors from entering the market and make the market susceptible to collusion. The NPK Fertilizer market exhibits the classic structural conditions under which collusion is more plausible and more durable: concentrated production, high fixed costs, dependence on scarce or geographically concentrated inputs, technically complex production processes, and substantial regulatory and logistical barriers that deter timely entry or expansion.

**5. Inelastic Demand**

122. Demand for fertilizer is highly inelastic: farmers must purchase nitrogen, phosphate, and potash each planting season regardless of price, because no substitutes exist for these essential crop nutrients. Industries with inelastic demand, such as the NPK Fertilizers industry, are more susceptible to cartel formation and behavior than industries with elastic demand.

123. A lack of substitute goods may be a characteristic of inelastic demand. NPK Fertilizers cannot be interchanged freely with other goods—although there are other fertilizers, NPK Fertilizers are unique because they provide precise, balanced nutrients, rapid soil availability, and broad crop adaptability, making them distinct from other fertilizers.

124. Customers similarly do not view NPK Fertilizers as interchangeable with other fertilizers.

**6. Unconcentrated Demand Side**

125. The unconcentrated nature of the demand side of the NPK Fertilizers market and lack of buyer power sufficient to stimulate competition also makes this market susceptible to collusion. Such a large number of buyers, each of whom forms a small share of the total marketplace, means that there is less incentive for Defendants or their Co-Conspirators to cheat on collusive pricing arrangements, since each potential sale is small, while the risk of disrupting the collusive pricing agreement carries large penalties.

**7. Opportunities to Exchange Competitively-Sensitive Information**

126. The reciprocal sharing of firm-specific competitively sensitive information that would normally remain private is a "super plus factor" that leads to a strong inference of active collusion.[102] As described above, Canpotex is a Canadian export marketing agency through which Defendants or their Co-Conspirators collectively sell their Canadian Potash into overseas markets. Canpotex allows Defendants and their Co-Conspirators to share a range of competitively sensitive data, including production data, pricing information, and sales volumes. The data Canpotex collects is data which would normally be kept confidential given its competitively sensitive nature.

**8. Defendants' Recidivist History**

127. Finally, the NPK Fertilizers industry has a history of antitrust scrutiny.

128. In the early 1990s, several Potash producers were the subject of a price-fixing investigation by the Antitrust Division of the United States Department of Justice.

129. In 2008, U.S. purchasers filed antitrust lawsuits alleging that major producers—including companies such as Mosaic, PotashCorp, and Agrium—coordinated production and sales

[102] Christopher R. Leslie, *The Probative Synergy of Plus Factors in Price-Fixing Litigation*, 115 Nw. Univ. L. Rev. 1581, 1608 (2021).

to keep potash prices artificially high.[103] There, plaintiffs alleged producers shared market information, allocated volumes, and restricted output as part of a "tight-knit global cartel."[104] Several companies later settled private antitrust claims, with settlements around $43.75 million each from firms such as Mosaic and PotashCorp (without admitting wrongdoing).[105]

## V. ANTICOMPETITIVE EFFECTS AND RELEVANT ANTITRUST MARKET

130. Defendants and their Co-Conspirators' anticompetitive conduct had the following effects, among others:

- Competition among Defendants and their Co-Conspirators has been restrained or eliminated with respect to NPK fertilizers;
- The price of NPK fertilizers has been fixed, stabilized, or maintained at artificially high levels; and
- Purchasers have been deprived of free and open competition for NPK fertilizers.

131. Defendants and their Co-Conspirators' violations of the antitrust laws have caused Plaintiff to pay higher prices for NPK fertilizers than they would have in the absence of Defendants' illegal contract, combination, or conspiracy, and, as a result, Plaintiff suffered damages in the form of overcharges paid on their NPK fertilizers purchases. This is an injury of the type that the antitrust laws were meant to punish and prevent. Defendants' price fixing agreement is per se unlawful, or, alternatively, are unlawful under either a quick look or rule of reason analysis.

---

[103] Fertilizerworks.com, *Potash Producers Must Face Buyers' U.S. Antitrust Lawsuit* (June 27, 2012), available at https://www.fertilizerworks.com/news/potash-producers-must-face-buyers%E2%80%99-us-antitrust-lawsuit ((discussing *Minn-Chem Inc. v. Agrium Inc.*, No. 10-1712 (7th Cir. 2008)).

[104] Courthouse News Service, *Potash Price-Fixing Conspiracy Alleged* (Sept. 12, 2008), available at https://www.courthousenews.com/potash-price-fixing-conspiracy-alleged/.

[105] PR Newswire, *The Mosaic Company Announces Settlement Of Potash Antitrust Litigation* (Jan. 30, 2013), available at https://www.prnewswire.com/news-releases/the-mosaic-company-announces-settlement-of-potash-antitrust-litigation-189020521.html.

132. Research from the American Antitrust Institute has found that the median overcharge imposed by hard-core fertilizer cartel members was approximately 41%, exceeding the 30% median overcharge observed across all industries from 1702 through 2010.[106] These findings underscore that the fertilizer industry has historically been among the most susceptible to anticompetitive coordination, and that consumers of fertilizer products bear disproportionate harm when such coordination occurs.

133. Under the *per se* standard, and additionally where, as here, there are demonstrable anticompetitive effects, a relevant product and geographic market need not be defined. But Plaintiff defines such market below in case their allegations are ultimately analyzed under a quick look or rule of reason analysis.

**A. The Relevant Product Market is NPK fertilizers.**

134. To the extent a relevant product market needs to be defined in this action, it is the market for NPK fertilizers.

135. Accordingly, there are no reasonable substitutes for NPK fertilizers, and they are a distinct product market.

136. Additionally, or in the alternative, individual submarkets exist for Nitrogen Fertilizers, Phosphate Fertilizers, and Potash.

**B. The Relevant Geographic Market is the United States.**

137. Should a geographic market need to be defined in this action, it is the United States. Defendants produce and distribute NPK fertilizers through locations across the United States and have increased NPK fertilizers prices nationwide.

---

[106] C. Robert Taylor and Diana L. Moss, *The Fertilizer Oligopoly: The case for Global Antitrust Enforcement*, 14 n.20 (Sept. 2013), available at https://www.antitrustinstitute.org/wp-content/uploads/2013/10/FertilizerMonograph.pdf.

## VI. STATUTE OF LIMITATIONS AND TOLLING

138. Plaintiff's claims are timely, and to the extent any claims might otherwise be subject to a statute of limitations defense, the running of any applicable limitations period was tolled by Defendants' fraudulent concealment of their conspiracy.

139. The conspiracy alleged is, by its very nature, self-concealing. The conspiracy alleged involved coordinated pricing and supply restriction decisions made privately among Defendants' senior executives, the details of which were not disclosed to Plaintiff or the public. Plaintiff had neither actual nor constructive knowledge of the facts constituting their claim for relief. Plaintiff did not discover and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged until shortly before filing this action.

140. Defendants and their Co-Conspirators effectively, affirmatively, and fraudulently concealed their anticompetitive agreement from Plaintiff. Defendants and their Co-Conspirators publicly and repeatedly attributed their supracompetitive pricing to a series of exogenous events and cost pressures—including pandemic-related disruptions, extreme weather events, geopolitical sanctions, foreign export restrictions, and the conflict in Ukraine. By offering these pretextual explanations, Defendants and their Co-Conspirators constructed a facially legitimate—but materially incomplete and misleading—narrative that concealed the true cause of the price increases: their coordinated agreement to fix prices and restrict supply.

141. Plaintiff had no knowledge of the unlawful conduct alleged in this Complaint, or any of the facts that could or would have led to the discovery thereof, until March 2026, when news of the DOJ's investigation into NPK fertilizers prices broke.

142. Due to Defendants and their Co-Conspirators' fraudulent concealment, any applicable statute of limitations affecting or limiting the rights of action by Plaintiff has been tolled during the period of such fraudulent concealment.

## VII. CLAIMS FOR RELIEF

### Count 1: Violation of Kansas Restraint of Trade Act, K.S.A 50-101, *et seq.*

143. Plaintiff repeats and re-alleges every allegation above as set forth above.

144. The Kansas Restraint of Trade Act aims to prohibit practices which, among other things, "tend to prevent full and free competition in the importation, transportation or sale of articles imported into this state . . . ." K.S.A. 50-112.

145. Beginning at a time currently unknown to Plaintiff, but at least as early as January 1, 2021 (further investigation and discovery may reveal an earlier date), and continuing through the present, Defendants and their Co-Conspirators entered into and engaged in a contract, combination, or conspiracy to unreasonably restrain trade in violation of K.S.A. 50-112.

146. The contract, combination, or conspiracy consisted of an agreement among Defendants and their Co-Conspirators to fix, raise, stabilize, or maintain at artificially high levels the price of NPK Fertilizer and involved the exchange of competitively sensitive information between and among Defendants and their Co-Conspirators, causing anticompetitive effects without sufficient procompetitive justifications.

147. Plaintiff has been injured and will continue to be injured in the form of overcharges on NPK Fertilizer.

148. Defendants' anticompetitive conduct had the following effects, among others:

- Competition among Defendants has been restrained or eliminated with respect to NPK Fertilizer prices;
- The prices of NPK Fertilizer have been fixed, stabilized, or maintained at artificially high levels; and
- Plaintiff was and is deprived of the benefits of free and open competition between and among Defendants and their Co-Conspirators.

149. This conduct is unlawful under the per se standard. Defendants' conduct is also unlawful under either a "quick look" or rule of reason analysis because the agreement is anticompetitive with no valid procompetitive justifications. Moreover, even if there were valid procompetitive justifications, such justifications could have been reasonably achieved through less restrictive means of competition

150. Plaintiff purchased NPK Fertilizer within the State of Kansas.

151. But for Defendants and their Co-Conspirators' conduct set forth, the price of NPK Fertilizer would have been lower, in an amount to be determined at trial.

152. Under the Kansas Restraint of Trade Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. K.S.A. 50-161(b).

153. Plaintiff was injured with respect to purchases of NPK Fertilizer in Kansas and are entitled to all forms of relief, including actual damages, reasonable attorneys' fees and costs, and injunctive relief.

**Count 2: Unjust Enrichment**

154. Plaintiff repeats and re-alleges every allegation above as set forth above.

155. Through their conduct, Defendants and their Co-Conspirators caused damages to Plaintiff.

156. By falsely reporting prices, Defendants and their Co-Conspirators artificially increased the demand for their NPK Fertilizer. By purchasing NPK Fertilizers at an inflated price in the United States, which Defendants forced them to do, Plaintiff conferred a benefit on Defendants in the form of the inflated and unconscionable price of the product.

157. Defendants appreciated the benefit because, were consumers not to purchase NPK Fertilizer, Defendants would have no sales and make no money off NPK Fertilizer sales in the aforementioned states.

158. Plaintiff conferred upon Defendants an economic benefit, in the nature of profits resulting from unlawful overcharges and the artificial increase in the demand of NPK Fertilizer to the economic detriment of Plaintiff. Defendants' acceptance and retention of the benefit is inequitable and unjust because the benefit was obtained by Defendants unconscionable sales, and unlawful acts.

159. Equity cannot in good conscience permit Defendants to be economically enriched for its unjust actions at Plaintiff expense and in violation of Kansas law, and therefore restitution or disgorgement or both of such economic enrichment is required. It would be futile for Plaintiff to seek a remedy from any party with whom they had privity of contract. Defendants have paid no consideration to anyone for any benefits received indirectly from Plaintiff.

160. Plaintiff is entitled to the amount of the Defendants' ill-gotten gains resulting from its unlawful, unjust, and inequitable conduct.

## VIII. DEMAND FOR RELIEF

WHEREFORE, Plaintiff, respectfully ask the Court for a judgment that:

161. Enters judgment against Defendants, and in favor of Plaintiff, holding Defendants liable for the antitrust violations alleged;

162. Awards a declaratory judgment that Defendants' price fixing for NPK Fertilizer was done for illegal, anticompetitive purposes, was an unreasonable restraint of trade, and had anticompetitive effects on the U.S. market for NPK Fertilizer in violation of the Kansas Restraint of Trade Act.

163. Awards Plaintiff actual, double, treble, and exemplary damages as permitted and as sustained by reason of the antitrust violations alleged, plus interest in accordance with law;

164. Awards such equitable relief as is necessary to correct for the anticompetitive market effects caused by Defendant's unlawful conduct, including disgorgement, restitution, and the creation of a constructive trust;

165. Awards Plaintiff the costs of suit, including reasonable attorneys' fees as provided by law; and

166. Directs such further relief as it may deem just and proper.

## IX. DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

Dated: May 4, 2026.

Respectfully submitted,

*/s/ Rex A. Sharp*
Rex A. Sharp, KS #12350
Isaac L. Diel, KS #14376
Hammons P. Hepner, KS #29138
SHARP LAW, LLP
4820 W. 75th Street
Prairie Village, KS 66208
(913) 901-0505
(913) 261-7564 Fax
rsharp@midwest-law.com
idiel@midwest-law.com
hhepner@midwest-law.com

--and--

Nathan Foreman, KS #22691
TATE, KITZE & FOREMAN, LLC
P.O. Box 909
Hugoton, KS 67951-0909
(620)544-2103
(620)544-2403 (fax)
nathan@hugotonlaw.com

--and--

Patrick J. Stueve, KS #13847
Steve N. Six, KS #16151
Benjamin J. Stueve, KS #28515
STUEVE SIEGEL HANSON LLP
460 Nichols Road, Suite 200
Kansas City, Missouri 64112
Telephone: (816) 714-7100
Facsimile: (816) 714-7101
stueve@stuevesiegel.com
six@stuevesiegel.com
ben.stueve@stuevesiegel.com

*Attorneys for Plaintiff Cow N Cake Farms*

ELECTRONICALLY FILED
2026 May 06 AM 8:27
CLERK OF THE STEVENS COUNTY DISTRICT COURT
CASE NUMBER: SV-2026-CV-000009
PII COMPLIANT

| | |
|---|---|
| **Court:** | Stevens County District Court |
| **Case Number:** | SV-2026-CV-000009 |
| **Case Title:** | Cow N Cake Farms vs. Koch Fertilizer, LLC, et al |
| **Type:** | ORD: Summons - Filer Drafted Summons to Koch Ag & Energy Solutions LLC |

SO ORDERED,

Jayme Brack

/s/ Jayme Brack, Deputy Clerk

**IN THE DISTRICT COURT OF STEVENS COUNTY, KANSAS**

| | |
|---|---|
| COW N CAKE FARMS, a general Partnership, on behalf of itself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>KOCH AG & ENERGY SOLUTIONS, LLC; KOCH FERTILIZER, LLC; KOCH AGRONOMIC SERVICES, LLC; and DOE ENTITIES #1-100,<br><br>Defendants. | Case No. _____________<br><br>**JURY TRIAL DEMANDED** |

Proceeding Pursuant to K.S.A. Chapter 60

**SUMMONS**

To: Koch Ag & Energy Solutions, LLC, 4601 E. Douglas Ave, #700, Wichita, KS 67218

A civil lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached petition or a motion under K.S.A. 60-212. Under Kansas Supreme Court Rule 113, you may seek from the clerk of the court an extension of up to 14 additional days to serve and to file an answer or a K.S.A. 60-212 motion.

If you fail within 21 days to serve and to file an answer or a K.S.A. 60-212 motion or obtain a Rule 113 extension, the court may enter default judgment against you for the relief demanded in the petition. If you were served outside of Kansas, however, the court may not enter default judgment against you until at least 30 days after service of this summons.

The answer or K.S.A. 60-212 motion must be served on the plaintiff's attorney, or the plaintiff if plaintiff has no attorney, at the following address:

Rex A. Sharp, KS #12350
Isaac L. Diel, KS #14376
Hammons P. Hepner, KS #29138
SHARP LAW, LLP
4820 W. 75th Street
Prairie Village, KS 66208

You also must file your answer or K.S.A. 60-212 motion with the court.

When you file an answer, you must state as a counterclaim(s) any related claim(s) that you may have against the plaintiff. If you fail to do so, you will thereafter be barred from making such claim(s) in any other action.

Date ______________ Clerk of the District Court.

Clerk's Seal By ______________________
Clerk or Deputy

**RETURN OF SERVICE OF SUMMONS ON AN INDIVIDUAL**

I certify that I served a copy of this summons and a copy of the petition and

______________________________________________________________

*(Insert name of any other documents served)*

on ______________________ in the following manner:
*(Name of defendant)*

______(1) **Personal Service** - on the ___ day of __________________, 2____, by delivering or offering to deliver the documents to the above-named person;

______(2) **Residence Service** - on the _ day of __________________, 2____, by leaving the documents at the dwelling or usual place of abode of the above-named person, with some person of suitable age and discretion who resides there;

______(3) **Residence Service** - on the _ day of __________________, 2____, by leaving a copy of the documents at the dwelling or usual place of abode of the above-named person and mailing to that person by first-class mail a notice that the copy has been left at the individual's dwelling or place of abode;

______(4) **Return Receipt Delivery** - by causing to be delivered on the _____ day of ______, 2____, the documents by return receipt delivery to the above-named person at the following address: ________________________________________ ______with delivery being made by the following person or entity: ____________ _________________________. A copy of the return receipt evidencing delivery is attached to this Return of Service.

______(5) **Return Receipt Delivery Refused** - by mailing on the ________________ day of _________________________, 2___, the documents by first-class, postage prepaid, to the above-named person at the following address: ______________________________________________________________.

______(6) **Other Method of Service -** _________________________________.
*(Describe other method of service allowed by law)*

______(7) **No Service**. The above-named person was not served for the following reason(s): ____________________________________________________________.

**CERTIFICATION OF**
**RETURN ON SERVICE OF SUMMONS**

**Affidavit of Service**

STATE OF KANSAS )
) ss.
COUNTY OF ____________)

I, ______________________, swear or affirm that the foregoing Return on Service
*(name)*
of Summons is true and correct.

Executed on ____________________, 2____.

______________________________
*(Signature of Person Service Process)*

Subscribed and sworn to before me this ____ day of _________________, 2____.

______________________________
*(Signature of Person Authorized to Administer Oaths)*

ELECTRONICALLY FILED
2026 May 06 AM 8:27
CLERK OF THE STEVENS COUNTY DISTRICT COURT
CASE NUMBER: SV-2026-CV-000009
PII COMPLIANT

| | |
|---|---|
| **Court:** | Stevens County District Court |
| **Case Number:** | SV-2026-CV-000009 |
| **Case Title:** | Cow N Cake Farms vs. Koch Fertilizer, LLC, et al |
| **Type:** | ORD: Summons - Filer Drafted Summons to Koch Agronomic Services LLC |

SO ORDERED,

Jayme Brack

/s/ Jayme Brack, Deputy Clerk

**IN THE DISTRICT COURT OF STEVENS COUNTY, KANSAS**

| | |
|---|---|
| COW N CAKE FARMS, a general Partnership, on behalf of itself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>KOCH AG & ENERGY SOLUTIONS, LLC; KOCH FERTILIZER, LLC; KOCH AGRONOMIC SERVICES, LLC; and DOE ENTITIES #1-100,<br><br>Defendants. | Case No. [______________]<br><br>**JURY TRIAL DEMANDED** |

Proceeding Pursuant to K.S.A. Chapter 60

**SUMMONS**

To: Koch Agronomic Services, LLC, 4601 E. Douglas Ave, #700, Wichita, KS 67218

A civil lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached petition or a motion under K.S.A. 60-212. Under Kansas Supreme Court Rule 113, you may seek from the clerk of the court an extension of up to 14 additional days to serve and to file an answer or a K.S.A. 60-212 motion.

If you fail within 21 days to serve and to file an answer or a K.S.A. 60-212 motion or obtain a Rule 113 extension, the court may enter default judgment against you for the relief demanded in the petition. If you were served outside of Kansas, however, the court may not enter default judgment against you until at least 30 days after service of this summons.

The answer or K.S.A. 60-212 motion must be served on the plaintiff's attorney, or the plaintiff if plaintiff has no attorney, at the following address:

Rex A. Sharp, KS #12350
Isaac L. Diel, KS #14376
Hammons P. Hepner, KS #29138
SHARP LAW, LLP
4820 W. 75th Street
Prairie Village, KS 66208

You also must file your answer or K.S.A. 60-212 motion with the court.

When you file an answer, you must state as a counterclaim(s) any related claim(s) that you may have against the plaintiff. If you fail to do so, you will thereafter be barred from making such claim(s) in any other action.

Date ______________ Clerk of the District Court.

Clerk's Seal By ______________________
Clerk or Deputy

**RETURN OF SERVICE OF SUMMONS ON AN INDIVIDUAL**

I certify that I served a copy of this summons and a copy of the petition and

______________________________________________________________

*(Insert name of any other documents served)*

on ______________________ in the following manner:
*(Name of defendant)*

______(1) **Personal Service** - on the ___ day of __________________, 2____, by delivering or offering to deliver the documents to the above-named person;

______(2) **Residence Service** - on the _ day of __________________, 2____, by leaving the documents at the dwelling or usual place of abode of the above-named person, with some person of suitable age and discretion who resides there;

______(3) **Residence Service** - on the _ day of __________________, 2____, by leaving a copy of the documents at the dwelling or usual place of abode of the above-named person and mailing to that person by first-class mail a notice that the copy has been left at the individual's dwelling or place of abode;

______(4) **Return Receipt Delivery** - by causing to be delivered on the _____ day of ______, 2____, the documents by return receipt delivery to the above-named person at the following address: ______________________________ ______with delivery being made by the following person or entity: ____________ _________________________. A copy of the return receipt evidencing delivery is attached to this Return of Service.

______(5) **Return Receipt Delivery Refused** - by mailing on the ________________ day of _________________________, 2___, the documents by first-class, postage prepaid, to the above-named person at the following address: ______________________________________________________________.

______(6) **Other Method of Service -** ________________________________.
*(Describe other method of service allowed by law)*

______(7) **No Service**. The above-named person was not served for the following reason(s): ____________________________________________________.

**CERTIFICATION OF**
**RETURN ON SERVICE OF SUMMONS**

**Affidavit of Service**

STATE OF KANSAS )
) ss.
COUNTY OF ____________)

I, ______________________, swear or affirm that the foregoing Return on Service
*(name)*
of Summons is true and correct.

Executed on ____________________, 2____.

________________________________
*(Signature of Person Service Process)*

Subscribed and sworn to before me this ____ day of __________________, 2____.

________________________________
*(Signature of Person Authorized to Administer Oaths)*

ELECTRONICALLY FILED
2026 May 06 AM 8:27
CLERK OF THE STEVENS COUNTY DISTRICT COURT
CASE NUMBER: SV-2026-CV-000009
PII COMPLIANT

| | |
|---|---|
| **Court:** | Stevens County District Court |
| **Case Number:** | SV-2026-CV-000009 |
| **Case Title:** | Cow N Cake Farms vs. Koch Fertilizer, LLC, et al |
| **Type:** | ORD: Summons - Filer Drafted Summons to Koch Fertilizer LLC |

SO ORDERED,

/s/ Jayme Brack, Deputy Clerk

**IN THE DISTRICT COURT OF STEVENS COUNTY, KANSAS**

| | |
|---|---|
| COW N CAKE FARMS, a general Partnership, on behalf of itself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>KOCH AG & ENERGY SOLUTIONS, LLC; KOCH FERTILIZER, LLC; KOCH AGRONOMIC SERVICES, LLC; and DOE ENTITIES #1-100,<br><br>Defendants. | Case No. [______________]<br><br>**JURY TRIAL DEMANDED** |

Proceeding Pursuant to K.S.A. Chapter 60

**SUMMONS**

To: Koch Fertilizer, LLC, 4601 E. Douglas Ave, #700, Wichita, KS 67218

A civil lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached petition or a motion under K.S.A. 60-212. Under Kansas Supreme Court Rule 113, you may seek from the clerk of the court an extension of up to 14 additional days to serve and to file an answer or a K.S.A. 60-212 motion.

If you fail within 21 days to serve and to file an answer or a K.S.A. 60-212 motion or obtain a Rule 113 extension, the court may enter default judgment against you for the relief demanded in the petition. If you were served outside of Kansas, however, the court may not enter default judgment against you until at least 30 days after service of this summons.

The answer or K.S.A. 60-212 motion must be served on the plaintiff's attorney, or the plaintiff if plaintiff has no attorney, at the following address:

Rex A. Sharp, KS #12350
Isaac L. Diel, KS #14376
Hammons P. Hepner, KS #29138
SHARP LAW, LLP
4820 W. 75th Street
Prairie Village, KS 66208

You also must file your answer or K.S.A. 60-212 motion with the court.

When you file an answer, you must state as a counterclaim(s) any related claim(s) that you may have against the plaintiff. If you fail to do so, you will thereafter be barred from making such claim(s) in any other action.

Date ______________ Clerk of the District Court.

Clerk's Seal By ______________________
Clerk or Deputy

**RETURN OF SERVICE OF SUMMONS ON AN INDIVIDUAL**

I certify that I served a copy of this summons and a copy of the petition and

______________________________________________________________
*(Insert name of any other documents served)*

on ______________________ in the following manner:
*(Name of defendant)*

______(1) **Personal Service** - on the ___ day of _________________, 2____, by delivering or offering to deliver the documents to the above-named person;

______(2) **Residence Service** - on the _ day of _________________, 2____, by leaving the documents at the dwelling or usual place of abode of the above-named person, with some person of suitable age and discretion who resides there;

______(3) **Residence Service** - on the _ day of _________________, 2____, by leaving a copy of the documents at the dwelling or usual place of abode of the above-named person and mailing to that person by first-class mail a notice that the copy has been left at the individual's dwelling or place of abode;

______(4) **Return Receipt Delivery** - by causing to be delivered on the _____ day of ______, 2____, the documents by return receipt delivery to the above-named person at the following address: ______________________________________ ______with delivery being made by the following person or entity: ____________ ________________________. A copy of the return receipt evidencing delivery is attached to this Return of Service.

______(5) **Return Receipt Delivery Refused** - by mailing on the _______________ day of ________________________, 2___, the documents by first-class, postage prepaid, to the above-named person at the following address: ______________________________________________________________.

______(6) **Other Method of Service -** ______________________________.
*(Describe other method of service allowed by law)*

______(7) **No Service**. The above-named person was not served for the following reason(s): ________________________________________________________.

**CERTIFICATION OF**
**RETURN ON SERVICE OF SUMMONS**

**Affidavit of Service**

STATE OF KANSAS )
) ss.
COUNTY OF ____________)

I, ______________________, swear or affirm that the foregoing Return on Service
*(name)*
of Summons is true and correct.

Executed on ____________________, 2____.

______________________________
*(Signature of Person Service Process)*

Subscribed and sworn to before me this ____ day of __________________, 2____.

______________________________
*(Signature of Person Authorized to Administer Oaths)*

ELECTRONICALLY FILED
2026 May 12 AM 8:28
CLERK OF THE STEVENS COUNTY DISTRICT COURT
CASE NUMBER: SV-2026-CV-000009
PII COMPLIANT

**IN THE DISTRICT COURT OF STEVENS COUNTY, KANSAS**

| | |
|---|---|
| CAKE N COW FARMS,<br><br>Plaintiff,<br><br>v.<br><br>KOCH AG & ENERGY SOLUTIONS, LLC; KOCH FERTILIZER, LLC; and KOCH AGRONOMIC SERVICES, LLC,<br><br>Defendants. | Case No. SV-2026-CV-000009 |

**UNOPPOSED MOTION TO CHANGE PARTY NAME**

Plaintiff Cake N Cow Farms was inadvertently named as "Cow N Cake Farms." To correct this misnomer, Plaintiff Cake N Cow Farms respectfully requests that the Court direct the Clerk of Court to change the party name on the docket of this action from "Cow N Cake Farms" to "Cake N Cow Farms." As no defendant has been served with a copy of this complaint, no other party has entered an appearance into this case and the motion is unopposed.

Dated: May 12, 2026

Respectfully Submitted,

*/s/ Rex A. Sharp*

Rex A. Sharp, KS #12350
Isaac L. Diel, KS #14376
Hammons P. Hepner, KS #29138
SHARP LAW, LLP
4820 W. 75th Street
Prairie Village, KS 66208
(913) 901-0505
(913) 261-7564 Fax
rsharp@midwest-law.com
idiel@midwest-law.com
hhepner@midwest-law.com

--and--

Nathan Foreman, KS #22691
TATE, KITZE & FOREMAN, LLC
P.O. Box 909
Hugoton, KS 67951-0909
(620)544-2103
(620)544-2403 (fax)
nathan@hugotonlaw.com

--and--

Patrick J. Stueve, KS #13847
Steve N. Six, KS #16151
Benjamin J. Stueve, KS #28515
STUEVE SIEGEL HANSON LLP
460 Nichols Road, Suite 200
Kansas City, Missouri 64112
Telephone: (816) 714-7100
Facsimile: (816) 714-7101
stueve@stuevesiegel.com
six@stuevesiegel.com
ben.stueve@stuevesiegel.com

*Attorneys for Plaintiff Cow N Cake Farms*

**CERTIFICATE OF SERVICE**

The undersigned certifies that the above and foregoing document was electronically filed on May 12, 2026, with the Clerk of the Court by using the Court's e-Filing system, which will send a notice of electronic filing to all counsel of record.

*/s/ Rex A. Sharp*
Rex A. Sharp

ELECTRONICALLY FILED
2026 May 19 AM 9:56
CLERK OF THE STEVENS COUNTY DISTRICT COURT
CASE NUMBER: SV-2026-CV-000009
PII COMPLIANT

| | |
|---|---|
| **Court:** | Stevens County District Court |
| **Case Number:** | SV-2026-CV-000009 |
| **Case Title:** | Cow N Cake Farms vs. Koch Fertilizer, LLC, et al |
| **Type:** | ORD: Order (Generic) Order Granting Plaintiffs' Unopposed Motion to Change Party Name |

SO ORDERED,

/s/ Honorable Bradley Ambrosier,
District Court Judge

**IN THE DISTRICT COURT OF STEVENS COUNTY, KANSAS**

| | |
|---|---|
| CAKE N COW FARMS,<br><br>Plaintiff,<br><br>v.<br><br>KOCH AG & ENERGY SOLUTIONS, LLC; KOCH FERTILIZER, LLC; and KOCH AGRONOMIC SERVICES, LLC,<br><br>Defendants. | Case No. SV-2026-CV-000009 |

**[PROPOSED] ORDER GRANTING PLAINTIFF'S UNOPPOSED MOTION TO CHANGE PARTY NAME**

Before the Court is Plaintiffs' Unopposed Motion to Change Party Name. For good cause show, the Motion is GRANTED.

IT IS THEREFORE ORDERED that that Plaintiff's Party Name has been changed from "Cow N Cake Farms" to "Cake N Cow Farms." The Clerk of Court is directed to change the party name on the docket of this action from "Cow N Cake Farms" to "Cake N Cow Farms."

IT IS SO ORDERED.

Signed: May _____, 2026.

__________________________________
BRADLEY E. AMBROSIER
DISTRICT JUDGE

ELECTRONICALLY FILED
2026 May 19 PM 2:56
CLERK OF THE STEVENS COUNTY DISTRICT COURT
CASE NUMBER: SV-2026-CV-000009
PII COMPLIANT

**Court:** Stevens County District Court

**Case Number:** SV-2026-CV-000009

**Case Title:** Cow N Cake Farms vs. Koch Fertilizer, LLC, et al

**Type:** ORD: Summons - Filer Drafted Summons to Koch Ag & Energy Solutions LLC

SO ORDERED,

/s/ Kelsee N. Burnett, Clerk of the District Court

**IN THE DISTRICT COURT OF STEVENS COUNTY, KANSAS**

| | |
|---|---|
| CAKE N COW FARMS, a general Partnership, on behalf of itself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>KOCH AG & ENERGY SOLUTIONS, LLC; KOCH FERTILIZER, LLC; KOCH AGRONOMIC SERVICES, LLC; and DOE ENTITIES #1-100,<br><br>Defendants. | Case No. SV-2026-CV-000009<br><br>**JURY TRIAL DEMANDED** |

Proceeding Pursuant to K.S.A. Chapter 60

**SUMMONS**

To: Koch Ag & Energy Solutions, LLC, 4601 E. Douglas Ave., #700, Wichita, KS 67218

A civil lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached petition or a motion under K.S.A. 60-212. Under Kansas Supreme Court Rule 113, you may seek from the clerk of the court an extension of up to 14 additional days to serve and to file an answer or a K.S.A. 60-212 motion.

If you fail within 21 days to serve and to file an answer or a K.S.A. 60-212 motion or obtain a Rule 113 extension, the court may enter default judgment against you for the relief demanded in the petition. If you were served outside of Kansas, however, the court may not enter default judgment against you until at least 30 days after service of this summons.

The answer or K.S.A. 60-212 motion must be served on the plaintiff's attorney, or the plaintiff if plaintiff has no attorney, at the following address:

Rex A. Sharp, KS #12350
Isaac L. Diel, KS #14376
Hammons P. Hepner, KS #29138
SHARP LAW, LLP
4820 W. 75th Street
Prairie Village, KS 66208

You also must file your answer or K.S.A. 60-212 motion with the court.

When you file an answer, you must state as a counterclaim(s) any related claim(s) that you may have against the plaintiff. If you fail to do so, you will thereafter be barred from making such claim(s) in any other action.

Date ______________ Clerk of the District Court.

Clerk's Seal By ______________________
Clerk or Deputy

**RETURN OF SERVICE OF SUMMONS ON AN INDIVIDUAL**

I certify that I served a copy of this summons and a copy of the petition and

______________________________________________________________
*(Insert name of any other documents served)*

on ______________________ in the following manner:
*(Name of defendant)*

______(1) **Personal Service** - on the ___ day of __________________, 2____, by delivering or offering to deliver the documents to the above-named person;

______(2) **Residence Service** - on the _ day of __________________, 2____, by leaving the documents at the dwelling or usual place of abode of the above-named person, with some person of suitable age and discretion who resides there;

______(3) **Residence Service** - on the _ day of __________________, 2____, by leaving a copy of the documents at the dwelling or usual place of abode of the above-named person and mailing to that person by first-class mail a notice that the copy has been left at the individual's dwelling or place of abode;

______(4) **Return Receipt Delivery** - by causing to be delivered on the _____ day of ______, 2____, the documents by return receipt delivery to the above-named person at the following address: ________________________________________ ______with delivery being made by the following person or entity: ____________ _________________________. A copy of the return receipt evidencing delivery is attached to this Return of Service.

______(5) **Return Receipt Delivery Refused** - by mailing on the ________________ day of _________________________, 2___, the documents by first-class, postage prepaid, to the above-named person at the following address:

_______________________________________________________________.

______(6) **Other Method of Service -** ________________________________.
*(Describe other method of service allowed by law)*

______(7) **No Service**. The above-named person was not served for the following reason(s): ____________________________________________________________.

**CERTIFICATION OF**
**RETURN ON SERVICE OF SUMMONS**

**Affidavit of Service**

STATE OF KANSAS )
) ss.
COUNTY OF ____________)

I, ______________________, swear or affirm that the foregoing Return on Service
*(name)*
of Summons is true and correct.

Executed on ____________________, 2____.

______________________________
*(Signature of Person Service Process)*

Subscribed and sworn to before me this ____ day of __________________, 2____.

______________________________
*(Signature of Person Authorized to Administer Oaths)*

ELECTRONICALLY FILED
2026 May 19 PM 2:57
CLERK OF THE STEVENS COUNTY DISTRICT COURT
CASE NUMBER: SV-2026-CV-000009
PII COMPLIANT

| | |
|---|---|
| **Court:** | Stevens County District Court |
| **Case Number:** | SV-2026-CV-000009 |
| **Case Title:** | Cow N Cake Farms vs. Koch Fertilizer, LLC, et al |
| **Type:** | ORD: Summons - Filer Drafted Summons to Koch Agronomic Services LLC |

SO ORDERED,

/s/ Kelsee N. Burnett, Clerk of the District Court

**IN THE DISTRICT COURT OF STEVENS COUNTY, KANSAS**

| | |
|---|---|
| CAKE N COW FARMS, a general partnership, on behalf of itself and all others similarly situated,<br><br>Plaintiff,<br><br>V.<br><br>KOCH AG & ENERGY SOLUTIONS, LLC; KOCH FERTILIZER, LLC; KOCH AGRONOMIC SERVICES, LLC; AND DOE ENTITIES #1-100,<br><br>Defendants. | Case No. SV-2026-CV-000009<br><br>**JURY TRIAL DEMANDED** |

Proceeding Pursuant to K.S.A. Chapter 60

**SUMMONS**

To: Koch Agronomic Services, LLC, 4601 E. Douglas Ave., #700, Wichita, KS 67218

A civil lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached petition or a motion under K.S.A. 60-212. Under Kansas Supreme Court Rule 113, you may seek from the clerk of the court an extension of up to 14 additional days to serve and to file an answer or a K.S.A. 60-212 motion.

If you fail within 21 days to serve and to file an answer or a K.S.A. 60-212 motion or obtain a Rule 113 extension, the court may enter default judgment against you for the relief demanded in the petition. If you were served outside of Kansas, however, the court may not enter default judgment against you until at least 30 days after service of this summons.

The answer or K.S.A. 60-212 motion must be served on the plaintiff's attorney, or the plaintiff if plaintiff has no attorney, at the following address:

Rex A. Sharp, KS #12350
Isaac L. Diel, KS #14376
Hammons P. Hepner, KS #29138
SHARP LAW, LLP
4820 W. 75th Street
Prairie Village, KS 66208

You also must file your answer or K.S.A. 60-212 motion with the court.

When you file an answer, you must state as a counterclaim(s) any related claim(s) that you may have against the plaintiff. If you fail to do so, you will thereafter be barred from making such claim(s) in any other action.

Date ______________ Clerk of the District Court.

Clerk's Seal By ______________________
Clerk or Deputy

**RETURN OF SERVICE OF SUMMONS ON AN INDIVIDUAL**

I certify that I served a copy of this summons and a copy of the petition and

______________________________________________________________
*(Insert name of any other documents served)*

on ______________________ in the following manner:
*(Name of defendant)*

______(1) **Personal Service** - on the ___ day of _________________, 2____, by delivering or offering to deliver the documents to the above-named person;

______(2) **Residence Service** - on the _ day of _________________, 2____, by leaving the documents at the dwelling or usual place of abode of the above-named person, with some person of suitable age and discretion who resides there;

______(3) **Residence Service** - on the _ day of _________________, 2____, by leaving a copy of the documents at the dwelling or usual place of abode of the above-named person and mailing to that person by first-class mail a notice that the copy has been left at the individual's dwelling or place of abode;

______(4) **Return Receipt Delivery** - by causing to be delivered on the _____ day of ______, 2____, the documents by return receipt delivery to the above-named person at the following address: ______________________________________ ______with delivery being made by the following person or entity: ____________ ________________________. A copy of the return receipt evidencing delivery is attached to this Return of Service.

______(5) **Return Receipt Delivery Refused** - by mailing on the _______________ day of ________________________, 2___, the documents by first-class, postage prepaid, to the above-named person at the following address: ______________________________________________________________.

______(6) **Other Method of Service -** ______________________________.
*(Describe other method of service allowed by law)*

______(7) **No Service**. The above-named person was not served for the following reason(s): ______________________________________________________.

**CERTIFICATION OF**
**RETURN ON SERVICE OF SUMMONS**

**Affidavit of Service**

STATE OF KANSAS )
) ss.
COUNTY OF ____________)

I, ______________________, swear or affirm that the foregoing Return on Service
*(name)*
of Summons is true and correct.

Executed on ____________________, 2____.

________________________________
*(Signature of Person Service Process)*

Subscribed and sworn to before me this ____ day of __________________, 2____.

________________________________
*(Signature of Person Authorized to Administer Oaths)*

ELECTRONICALLY FILED
2026 May 19 PM 2:57
CLERK OF THE STEVENS COUNTY DISTRICT COURT
CASE NUMBER: SV-2026-CV-000009
PII COMPLIANT

| | |
|---|---|
| **Court:** | Stevens County District Court |
| **Case Number:** | SV-2026-CV-000009 |
| **Case Title:** | Cake N Cow Farms vs. Koch Ag & Energy Solutions, LLC, et al |
| **Type:** | ORD: Summons - Filer Drafted Summons to Koch Fertilizer LLC |

SO ORDERED,

Kelsee N. Burnett

/s/ Kelsee N. Burnett, Clerk of the District Court

**IN THE DISTRICT COURT OF STEVENS COUNTY, KANSAS**

| | |
|---|---|
| CAKE N COW FARMS, a general partnership, on behalf of itself and all others similarly situated,<br><br>Plaintiff,<br><br>V.<br><br>KOCH AG & ENERGY SOLUTIONS, LLC; KOCH FERTILIZER, LLC; KOCH AGRONOMIC SERVICES, LLC; AND DOE ENTITIES #1-100,<br><br>Defendants. | Case No. SV-2026-CV-000009<br><br>**JURY TRIAL DEMANDED** |

Proceeding Pursuant to K.S.A. Chapter 60

**SUMMONS**

To: Koch Fertilizer, LLC, 4601 E. Douglas Ave., #700, Wichita, KS 67218

A civil lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached petition or a motion under K.S.A. 60-212. Under Kansas Supreme Court Rule 113, you may seek from the clerk of the court an extension of up to 14 additional days to serve and to file an answer or a K.S.A. 60-212 motion.

If you fail within 21 days to serve and to file an answer or a K.S.A. 60-212 motion or obtain a Rule 113 extension, the court may enter default judgment against you for the relief demanded in the petition. If you were served outside of Kansas, however, the court may not enter default judgment against you until at least 30 days after service of this summons.

The answer or K.S.A. 60-212 motion must be served on the plaintiff's attorney, or the plaintiff if plaintiff has no attorney, at the following address:

Rex A. Sharp, KS #12350
Isaac L. Diel, KS #14376
Hammons P. Hepner, KS #29138
SHARP LAW, LLP
4820 W. 75th Street
Prairie Village, KS 66208

You also must file your answer or K.S.A. 60-212 motion with the court.

When you file an answer, you must state as a counterclaim(s) any related claim(s) that you may have against the plaintiff. If you fail to do so, you will thereafter be barred from making such claim(s) in any other action.

Date ______________ Clerk of the District Court.

Clerk's Seal By ______________________
Clerk or Deputy

**RETURN OF SERVICE OF SUMMONS ON AN INDIVIDUAL**

I certify that I served a copy of this summons and a copy of the petition and

______________________________________________________________________

*(Insert name of any other documents served)*

on ______________________ in the following manner:
*(Name of defendant)*

______(1) **Personal Service** - on the ___ day of __________________, 2____, by delivering or offering to deliver the documents to the above-named person;

______(2) **Residence Service** - on the __ day of __________________, 2____, by leaving the documents at the dwelling or usual place of abode of the above-named person, with some person of suitable age and discretion who resides there;

______(3) **Residence Service** - on the __ day of __________________, 2____, by leaving a copy of the documents at the dwelling or usual place of abode of the above-named person and mailing to that person by first-class mail a notice that the copy has been left at the individual's dwelling or place of abode;

______(4) **Return Receipt Delivery** - by causing to be delivered on the _____ day of ______, 2____, the documents by return receipt delivery to the above-named person at the following address: ______________________________________ ______with delivery being made by the following person or entity: ____________ _________________________. A copy of the return receipt evidencing delivery is attached to this Return of Service.

______(5) **Return Receipt Delivery Refused** - by mailing on the ________________ day of _________________________, 2___, the documents by first-class, postage prepaid, to the above-named person at the following address: ______________________________________________________________.

______(6) **Other Method of Service -** ________________________________.
*(Describe other method of service allowed by law)*

______(7) **No Service**. The above-named person was not served for the following reason(s): ____________________________________________________________.

**CERTIFICATION OF**
**RETURN ON SERVICE OF SUMMONS**

**Affidavit of Service**

STATE OF KANSAS )
) ss.
COUNTY OF ____________)

I, ______________________, swear or affirm that the foregoing Return on Service
*(name)*
of Summons is true and correct.

Executed on ___________________, 2____.

______________________________
*(Signature of Person Service Process)*

Subscribed and sworn to before me this ____ day of _________________, 2____.

______________________________
*(Signature of Person Authorized to Administer Oaths)*

ELECTRONICALLY FILED
2026 May 28 AM 11:16
CLERK OF THE STEVENS COUNTY DISTRICT COURT
CASE NUMBER: SV-2026-CV-000009
PII COMPLIANT

# AFFIDAVIT OF SERVICE

**State of Kansas** **County of Stevens** **District Court**

Case Number: SV-2026-CV-000009

POW2026006897

Plaintiff: **Cake N Cow Farms**
vs.
Defendant: **Koch Ag & Energy Solutions, LLC et al**

For: Sharp Law

Received by D & B Legal Service, LLC to be served on **Koch Ag & Energy Solutions, LLC, 4601 E. Douglas Ave., #700, Wichita, KS 67218.** I, Jacob Petersen, being duly sworn, depose and say that on the 21st day of May, 2026 at 12:45 pm., executed service by delivering a true copy of the **Summons, Petition, Unopposed Motion to Change Party Name, [proposed] Order Granting Plaintiff's Unopposed Motion to Change Party Name, Plaintiff's First Set of Requests for Production to Defendants Koch Ag & Energy Solutions, LLC, Koch Fertilizer, LLC, and Koch Agronomic Services, LLC** in accordance with state statutes in the manner marked below:

( ) CORPORATE SERVICE: By serving ______________________ as ______________________.

( ) CORPORATE SERVICE AT ALTERNATE ADDRESS: By serving ______________________ as ______________________ at the alternate address of ______________________.

(X) AUTHORIZED SERVICE: By serving Jaqueline Atherstone as Authorized Agent

( )NON SERVICE: For the reason detailed in the Comments below.

**COMMENTS:** ______________________

Age 65 Sex M (F) Race White Height 5'6 Weight 160 Hair Black Glasses (Y) N

I certify that I have no interest in the above action, am of legal age and have proper authority in the jurisdiction in which this service was made.

Subscribed and Sworn to before me on the 21 day of May, 2026 by the affiant who is personally known to me in the State of Kansas and County of Sedgwick.

[signature]
NOTARY PUBLIC

CRISTAL MORALES
Notary Public, State of Kansas
My Appointment Expires
9-13-2027

[signature]
PROCESS SERVER # 06168
Appointed in accordance with State Statutes

**D & B Legal Service, LLC**
**5350 W 94th Ter Ste 206**
**Prairie Village, KS 66207**
**(913) 362-8110**

Our Job Serial Number: 2026006897

Copyright © 1992-2026 DreamBuilt Software, LLC. - Process Server's Toolbox V

ELECTRONICALLY FILED
2026 May 19 PM 2:56
CLERK OF THE STEVENS COUNTY DISTRICT COURT
CASE NUMBER: SV-2026-CV-000009
PII COMPLIANT




| | |
|---|---|
| **Court:** | Stevens County District Court |
| **Case Number:** | SV-2026-CV-000009 |
| **Case Title:** | Cow N Cake Farms vs. Koch Fertilizer, LLC, et al |
| **Type:** | ORD: Summons - Filer Drafted Summons to Koch Ag & Energy Solutions LLC |

SO ORDERED,

Kelsee N. Burnett

/s/ Kelsee N. Burnett, Clerk of the District Court

**IN THE DISTRICT COURT OF STEVENS COUNTY, KANSAS**

| | |
|---|---|
| CAKE N COW FARMS, a general Partnership, on behalf of itself and all others similarly situated,<br><br>Plaintiff,<br><br>v. | Case No. SV-2026-CV-000009 |
| KOCH AG & ENERGY SOLUTIONS, LLC; KOCH FERTILIZER, LLC; KOCH AGRONOMIC SERVICES, LLC; and DOE ENTITIES #1-100,<br><br>Defendants. | **JURY TRIAL DEMANDED** |

Proceeding Pursuant to K.S.A. Chapter 60

**SUMMONS**

To: Koch Ag & Energy Solutions, LLC, 4601 E. Douglas Ave., #700, Wichita, KS 67218

A civil lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached petition or a motion under K.S.A. 60-212. Under Kansas Supreme Court Rule 113, you may seek from the clerk of the court an extension of up to 14 additional days to serve and to file an answer or a K.S.A. 60-212 motion.

If you fail within 21 days to serve and to file an answer or a K.S.A. 60-212 motion or obtain a Rule 113 extension, the court may enter default judgment against you for the relief demanded in the petition. If you were served outside of Kansas, however, the court may not enter default judgment against you until at least 30 days after service of this summons.

The answer or K.S.A. 60-212 motion must be served on the plaintiff's attorney, or the plaintiff if plaintiff has no attorney, at the following address:

ELECTRONICALLY FILED
2026 May 28 AM 11:16
CLERK OF THE STEVENS COUNTY DISTRICT COURT
CASE NUMBER: SV-2026-CV-000009
PII COMPLIANT

# AFFIDAVIT OF SERVICE

**State of Kansas** **County of Stevens** **District Court**

Case Number: SV-2026-CV-000009

POW2026006899

Plaintiff: **Cake N Cow Farms**
vs.
Defendant: **Koch Ag & Energy Solutions, LLC et al**

For: Sharp Law

Received by D & B Legal Service, LLC to be served on **Koch Agronomic Services, LLC, 4601 E. Douglas Ave., #700, Wichita, KS 67218**. I, Jacob Peterson, being duly sworn, depose and say that on the 21st day of May, 2026 at 12:45 pm., executed service by delivering a true copy of the **Summons, Petition, Unopposed Motion to Change Party Name, [proposed] Order Granting Plaintiff's Unopposed Motion to Change Party Name, Plaintiff's First Set of Requests for Production to Defendants Koch Ag & Energy Solutions, LLC, Koch Fertilizer, LLC, and Koch Agronomic Services, LLC** in accordance with state statutes in the manner marked below:

( ) CORPORATE SERVICE: By serving ______________ as ______________.

( ) CORPORATE SERVICE AT ALTERNATE ADDRESS: By serving ______________ as ______________ at the alternate address of ______________.

(X) AUTHORIZED SERVICE: By serving Jaqueline Atherstone as Authorized Agent

( )NON SERVICE: For the reason detailed in the Comments below.

**COMMENTS:**______________

Age 65 Sex M (F) Race White Height 5'6 Weight 160 Hair Black Glasses (Y) N

I certify that I have no interest in the above action, am of legal age and have proper authority in the jurisdiction in which this service was made.

Subscribed and Sworn to before me on the 21 day of May, 2026 by the affiant who is personally known to me in the State of Kansas and County of Sedgwick.

[signature]
NOTARY PUBLIC

CRISTAL MORALES
Notary Public, State of Kansas
My Appointment Expires
9-13-2027

[signature]
PROCESS SERVER # 06168
Appointed in accordance with State Statutes

**D & B Legal Service, LLC**
**5350 W 94th Ter Ste 206**
**Prairie Village, KS 66207**
**(913) 362-8110**

Our Job Serial Number: 2026006899

Copyright © 1992-2026 DreamBuilt Software, LLC. - Process Server's Toolbox V

ELECTRONICALLY FILED
2026 May 19 PM 2:57
CLERK OF THE STEVENS COUNTY DISTRICT COURT
CASE NUMBER: SV-2026-CV-000009
PII COMPLIANT

| | |
|---|---|
| **Court:** | Stevens County District Court |
| **Case Number:** | SV-2026-CV-000009 |
| **Case Title:** | Cow N Cake Farms vs. Koch Fertilizer, LLC, et al |
| **Type:** | ORD: Summons - Filer Drafted Summons to Koch Agronomic Services LLC |

SO ORDERED,

Kelsee N. Burnett

/s/ Kelsee N. Burnett, Clerk of the District Court

**IN THE DISTRICT COURT OF STEVENS COUNTY, KANSAS**

CAKE N COW FARMS, a general partnership, on behalf of itself and all others similarly situated,

Plaintiff,

V.

KOCH AG & ENERGY SOLUTIONS, LLC; KOCH FERTILIZER, LLC; KOCH AGRONOMIC SERVICES, LLC; AND DOE ENTITIES #1-100,

Defendants.

Case No. SV-2026-CV-000009

**JURY TRIAL DEMANDED**

Proceeding Pursuant to K.S.A. Chapter 60

**SUMMONS**

To: Koch Agronomic Services, LLC, 4601 E. Douglas Ave., #700, Wichita, KS 67218

A civil lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached petition or a motion under K.S.A. 60-212. Under Kansas Supreme Court Rule 113, you may seek from the clerk of the court an extension of up to 14 additional days to serve and to file an answer or a K.S.A. 60-212 motion.

If you fail within 21 days to serve and to file an answer or a K.S.A. 60-212 motion or obtain a Rule 113 extension, the court may enter default judgment against you for the relief demanded in the petition. If you were served outside of Kansas, however, the court may not enter default judgment against you until at least 30 days after service of this summons.

The answer or K.S.A. 60-212 motion must be served on the plaintiff's attorney, or the plaintiff if plaintiff has no attorney, at the following address:

ELECTRONICALLY FILED
2026 May 28 AM 11:16
CLERK OF THE STEVENS COUNTY DISTRICT COURT
CASE NUMBER: SV-2026-CV-000009
PII COMPLIANT

# AFFIDAVIT OF SERVICE

**State of Kansas** **County of Stevens** **District Court**

Case Number: SV-2026-CV-000009

POW2026006900

Plaintiff: **Cake N Cow Farms**
vs.
Defendant: **Koch Ag & Energy Solutions, LLC et al**

For: Sharp Law

Received by D & B Legal Service, LLC to be served on **Koch Fertilizer, LLC, 4601 E. Douglas Ave., #700, Wichita, KS 67218**. I, Jacob Petersen, being duly sworn, depose and say that on the 21st day of May, 2026 at 12:45 pm., executed service by delivering a true copy of the **Summons, Petition, Unopposed Motion to Change Party Name, [proposed] Order Granting Plaintiff's Unopposed Motion to Change Party Name, Plaintiff's First Set of Requests for Production to Defendants Koch Ag & Energy Solutions, LLC, Koch Fertilizer, LLC, and Koch Agronomic Services, LLC** in accordance with state statutes in the manner marked below:

( ) CORPORATE SERVICE: By serving ____________ as ____________.

( ) CORPORATE SERVICE AT ALTERNATE ADDRESS: By serving ____________ as ____________ at the alternate address of ____________.

(X) AUTHORIZED SERVICE: By serving Jaquetine Allerston as Authorized Agent

( )NON SERVICE: For the reason detailed in the Comments below.

COMMENTS: ____________

Age 65 Sex M (F) Race White Height 5'6 Weight 160 Hair Black Glasses (Y) N

I certify that I have no interest in the above action, am of legal age and have proper authority in the jurisdiction in which this service was made.

Subscribed and Sworn to before me on the 21 day of May, 2026 by the affiant who is personally known to me in the State of Kansas and County of Sedgwick

[signature]
NOTARY PUBLIC

CRISTAL MORALES
Notary Public, State of Kansas
My Appointment Expires
9-13-2027

[signature]
PROCESS SERVER # 06118
Appointed in accordance with State Statutes

**D & B Legal Service, LLC**
**5350 W 94th Ter Ste 206**
**Prairie Village, KS 66207**
**(913) 362-8110**

Our Job Serial Number: 2026006900

Copyright © 1992-2026 DreamBuilt Software, LLC. - Process Server's Toolbox V

ELECTRONICALLY FILED
2026 May 19 PM 2:57
CLERK OF THE STEVENS COUNTY DISTRICT COURT
CASE NUMBER: SV-2026-CV-000009
PII COMPLIANT



| | |
|---|---|
| **Court:** | Stevens County District Court |
| **Case Number:** | SV-2026-CV-000009 |
| **Case Title:** | Cake N Cow Farms vs. Koch Ag & Energy Solutions, LLC, et al |
| **Type:** | ORD: Summons - Filer Drafted Summons to Koch Fertilizer LLC |

SO ORDERED,

/s/ Kelsee N. Burnett, Clerk of the District Court

**IN THE DISTRICT COURT OF STEVENS COUNTY, KANSAS**

CAKE N COW FARMS, a general partnership, on behalf of itself and all others similarly situated,

Plaintiff,

V.

KOCH AG & ENERGY SOLUTIONS, LLC; KOCH FERTILIZER, LLC; KOCH AGRONOMIC SERVICES, LLC; AND DOE ENTITIES #1-100,

Defendants.

Case No. SV-2026-CV-000009

**JURY TRIAL DEMANDED**

Proceeding Pursuant to K.S.A. Chapter 60

**SUMMONS**

To: Koch Fertilizer, LLC, 4601 E. Douglas Ave., #700, Wichita, KS 67218

A civil lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached petition or a motion under K.S.A. 60-212. Under Kansas Supreme Court Rule 113, you may seek from the clerk of the court an extension of up to 14 additional days to serve and to file an answer or a K.S.A. 60-212 motion.

If you fail within 21 days to serve and to file an answer or a K.S.A. 60-212 motion or obtain a Rule 113 extension, the court may enter default judgment against you for the relief demanded in the petition. If you were served outside of Kansas, however, the court may not enter default judgment against you until at least 30 days after service of this summons.

The answer or K.S.A. 60-212 motion must be served on the plaintiff's attorney, or the plaintiff if plaintiff has no attorney, at the following address:

ELECTRONICALLY FILED
2026 Jun 05 PM 1:26
CLERK OF THE STEVENS COUNTY DISTRICT COURT
CASE NUMBER: SV-2026-CV-000009
PII COMPLIANT

**IN THE DISTRICT COURT OF STEVENS COUNTY, KANSAS**

COW N CAKE FARMS,

Plaintiff,

vs.

KOCH AG & ENERGY SOLUTIONS, LLC; KOCH FERTILIZER, LLC; and KOCH AGRONOMIC SERVICES, LLC,

Defendants.

Case No. SV-2026-CV-000009

Pursuant To Chapter 60

**ENTRY OF APPEARANCE**

Sean W. Colligan of Stinson LLP hereby enters his appearance in this case on behalf of Defendants Koch Ag & Energy Solutions, LLC; Koch Fertilizer, LLC; and Koch Agronomic Services, LLC.

.

Respectfully submitted,

*/s/ Sean W. Colligan*
Sean W. Colligan, KS #25727
STINSON LLP
1201 Walnut Street, Suite 2900
Kansas City, MO 64106
Tel: (816) 691-3384
Fax: (816) 691-3495
sean.colligan@stinson.com
*Attorney for Defendants*

**Certificate of Service**

I hereby certify that on this 5th day of June, 2026, the above and foregoing was filed with the Court through its CM/ECF system, which automatically sent a copy to all parties of record.

*/s/ Sean W. Colligan*

ELECTRONICALLY FILED
2026 Jun 05 PM 3:51
CLERK OF THE STEVENS COUNTY DISTRICT COURT
CASE NUMBER: SV-2026-CV-000009
PII COMPLIANT

| | |
|---|---|
| **Court:** | Stevens County District Court |
| **Case Number:** | SV-2026-CV-000009 |
| **Case Title:** | Cake N Cow Farms vs. Koch Ag & Energy Solutions, LLC, et al |
| **Type:** | ORD: Clerk's Extension Clerks' Extension of Time |

SO ORDERED,

Kelsee N. Burnett

/s/ Kelsee N. Burnett, Clerk of the District Court

**IN THE DISTRICT COURT OF STEVENS COUNTY, KANSAS**

COW N CAKE FARMS,

Plaintiff,

vs.

KOCH AG & ENERGY SOLUTIONS, LLC; KOCH FERTILIZER, LLC; and KOCH AGRONOMIC SERVICES, LLC,

Defendants.

Case No. SV-2026-CV-000009

Pursuant To Chapter 60

**CLERK'S EXTENSION OF TIME**

Defendants Koch Ag & Energy Solutions, LLC; Koch Fertilizer, LLC; and Koch Agronomic Services, LLC are hereby granted a 14-day extension of time from June 11, 2026 through and including June 25, 2026 in which to answer or otherwise respond to the Petition. The time originally prescribed for Defendants' Answer has not expired.

BY ORDER OF THE CLERK, pursuant to Supreme Court Rule 113.

By: ______________________________
Clerk of District Court

Submitted by:

*/s/ Sean W. Colligan*
Sean W. Colligan, KS #25727
STINSON LLP
1201 Walnut Street, Suite 2900
Kansas City, MO 64106
Tel: (816) 691-3384
Fax: (816) 691-3495
sean.colligan@stinson.com
*Attorney for Defendants*

**Certificate of Service**

I hereby certify that on this 5th day of June, 2026, the above and foregoing was filed with the Court through its CM/ECF system, which automatically sent a copy to all parties of record.

*/s/ Sean W. Colligan*

ELECTRONICALLY FILED
2026 Jun 05 PM 3:52
CLERK OF THE STEVENS COUNTY DISTRICT COURT
CASE NUMBER: SV-2026-CV-000009
PII COMPLIANT

| | |
|---|---|
| **Court:** | Stevens County District Court |
| **Case Number:** | SV-2026-CV-000009 |
| **Case Title:** | Cake N Cow Farms vs. Koch Ag & Energy Solutions, LLC, et al |
| **Type:** | ORD: Clerk's Extension Clerk's Extension of Time |

SO ORDERED,

/s/ Kelsee N. Burnett, Clerk of the District Court

**IN THE DISTRICT COURT OF STEVENS COUNTY, KANSAS**

COW N CAKE FARMS,

Plaintiff,

vs.

KOCH AG & ENERGY SOLUTIONS, LLC; KOCH FERTILIZER, LLC; and KOCH AGRONOMIC SERVICES, LLC,

Defendants.

Case No. SV-2026-CV-000009

Pursuant To Chapter 60

**CLERK'S EXTENSION OF TIME**

Defendants Koch Ag & Energy Solutions, LLC; Koch Fertilizer, LLC; and Koch Agronomic Services, LLC are hereby granted a 14-day extension of time from June 11, 2026 through and including June 25, 2026 in which to answer or otherwise respond to the Petition. The time originally prescribed for Defendants' Answer has not expired.

BY ORDER OF THE CLERK, pursuant to Supreme Court Rule 113.

By: ______________________________
Clerk of District Court

Submitted by:

*/s/ Sean W. Colligan*
Sean W. Colligan, KS #25727
STINSON LLP
1201 Walnut Street, Suite 2900
Kansas City, MO 64106
Tel: (816) 691-3384
Fax: (816) 691-3495
sean.colligan@stinson.com
*Attorney for Defendants*

**Certificate of Service**

I hereby certify that on this 5th day of June, 2026, the above and foregoing was filed with the Court through its CM/ECF system, which automatically sent a copy to all parties of record.

*/s/ Sean W. Colligan*